IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| Plaintiff, | § | |
| v. | § § | 2:22-CR-42-Z-BR |
| MANDIS CHARLES BARROW (1)<br>STEPHANIE ANN SALDANA (2) | § § § § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Codefendants Mandis Charles Barrow ("Barrow") and Stephanie Ann Saldana ("Saldana") (collectively "Codefendants") move to suppress all evidence seized from their vehicle during a February 18, 2021 traffic stop. Their Motion to Suppress ("Motion") alleges two Fourth Amendment violations occurred during the traffic stop: (1) the officer had no reasonable suspicion to initially pull them over; and (2) the officer improperly extended the stop. ECF No. 57 at 2–3. Because the Courts **FINDS** both the inception and the extension of the traffic stop were constitutional, the Court **DENIES** the Motion.[1]

**I.    Background[2]**

A historic winter storm blew through Texas in February 2021. A large majority of the state lost power between February 14 and 20, half did not have water, and storm-related financial losses totaled up to $130 billion.[3] The record-breaking storm began with freezing rain that coated the

---

[1] As required by Federal Rule of Criminal Procedure 12(d), the Court sets forth its essential findings in this memorandum opinion and order.

[2] The facts in this section are taken from the parties' briefing (ECF Nos. 57 and 59) and from the exhibits and testimony presented at the November 30, 2022 suppression hearing.

[3] Jess Donald, *Winter Storm Uri 2021*, FISCAL NOTES (Oct. 2021), https://comptroller.texas.gov/economy/fiscal-notes/2021/oct/winter-storm-impact.php.

state with up to one-half inch of ice, followed by snowfall on February 14 through 17. The Dallas-Fort Worth area was submerged in five inches of snow. *Id.*

Rhome Police Department Officer Mark Moore ("Officer Moore") was on patrol in the late evening of February 18, 2021. At around 9:00 PM, he pulled into the Big Z gas station parking lot in Rhome, Texas, just northwest of Fort Worth. At the same time, Codefendants had parked their silver Chevrolet Camaro at one of the gas pumps. *See* ECF No. 57 at 3. Officer Moore testified that he noticed the Camaro did not have a front license plate, in violation of Texas Transportation Code Section 504.943. He decided to check the rear license-plate number in the police database, typing the digits on his computer while circling the Camaro. But Officer Moore made a mistake. He mistyped the digits — entering LPV5652 into the database, while the rear license plate actually read LPV5262. The database showed the plate number LPV5652 was previously registered to another vehicle, had been cancelled, and did not have valid insurance. *See* ECF No. 59 at 7.

Codefendants left the Big Z parking lot, traveling west on Highway 114. Officer Moore followed, eventually activating his emergency lights as they passed over Highway 287. Codefendants came to a stop after pulling into the Love's Travel Center parking lot. *Id.* Upon approaching the Camaro, the Officer informed Codefendants he pulled them over because the vehicle was uninsured. Exh. 6 at 1. Saldana, sitting in the passenger seat, stated she recently updated the insurance, and that the vehicle was hers. Both Codefendants stated they were traveling "back to Amarillo" from Fort Worth, and that Barrow lived in Fort Worth while Saldana lived in Amarillo. *Id.* Officer Moore took a photograph of the Camaro's VIN displayed on the front windshield, returned to his patrol vehicle, and input the VIN and Codefendants' driver licensing information into the police database.

Officer Moore learned that unlike the license plate number he entered earlier, the VIN matched the vehicle with proper insurance. He entered the VIN twice again, mumbling to himself that the results were "strange, strange, strange." Exh. 2 at 04:52. He then provided dispatch with Codefendants' driver license numbers. He learned Barrow, the driver of the vehicle, had a long criminal history and was currently on federal probation. *Id.* at 11:01–11:37. He returned to the Camaro and requested Saldana step outside the vehicle to speak with him about her car. Officer Moore explained the inconsistent results in the police database and questioned her about the Camaro's registration history, saying he would show her the conflicting reports "here in a minute." Exh. 6 at 3.

But first, Officer Moore inquired more about her travel plans. Saldana responded that they had traveled to Fort Worth to visit Barrow's brother, but did not know where that brother resided. Saldana also stated she had dated Barrow "for a few months," that she was unaware of his criminal history, and that she resided in Amarillo while he resided in Fort Worth. *Id.* at 3–4. Officer Moore then approached Barrow, asking about his criminal history. Barrow responded he had gone to prison for "an illegal drug bust that happened in Tulia back in 1999." *Id.* at 5. He acknowledged he was on parole "for drugs." *Id.*

Officer Moore returned to his conversation with Saldana, who informed him they left Amarillo that morning and were headed back that same day. When the officer inquired the reason for the one-day trip, Saldana responded, "His, uh, uncle or something just died, I don't know, from COVID or something, he got a COVID shot, and he just died." *Id.* at 6. In response to Officer Moore's questioning, she emphatically denied that there would be any illegal substances or firearms in the Camaro. It was at this moment — sixteen minutes into the traffic stop[4] — that

---

[4] The Court ascertains the traffic stop began at approximately the 01:30 mark in Exhibit 3, which is Officer Moore's body camera footage. The Court's noted timestamps will therefore be consistent with that start time.

Saldana told the officer, "I'm actually a police officer in Amarillo." *Id.* at 7. She presented an identification card from Amarillo College labeled "Police Officer." Exh. 10. Saldana furthermore denied knowledge of Barrow's federal parole status when Officer Moore asked, "[W]hat would your agency think about you being with someone who is on federal probation for narcotic charges?" Exh. 6 at 8. She was unable to provide any further law enforcement identification and did not know her Personal Identification number ("PID") despite serving as a police officer for six years. *Id.* at 8–9.

After expressing confusion about why a self-identified police officer would not know or possess any law enforcement identification, Officer Moore told Saldana he would contact the College to confirm her employment. "You should know your PID number. . . . Most agencies require at a minimum you carry your agency ID and your TCOLE card." Saldana responded, "Yes, I know . . . but I'm taking a break from the college right now." *Id.* at 10. When Officer Moore informed her that falsely claiming to be a law enforcement officer is a crime, Saldana insisted, "I said I *used* to work for the college." *Id.* at 11 (emphasis added). When asked the type of discharge she received and the reason for that discharge, she asserted, "That's personal." *Id.* at 13. Officer Moore reiterated his concern about the license plate results, and explained to Saldana that he found it suspicious that before he pulled them over, the Camaro traveled from one gas station to another, seemingly to evade law enforcement. Saldana responded that they traveled to the second station to continue fueling the Camaro, claiming the thirty dollars spent at the Big Z did not fill the gas tank. *Id.* at 12.

At this point, just under twenty-three minutes into the traffic stop, Officer Moore contacted dispatch to request a point of contact at Amarillo College and to check the availability of a K-9 unit to perform a sniff test of the vehicle. At the suppression hearing, Officer Moore explained that

Rhome does not have its own K-9 unit, and, therefore, routinely request units from the Wise County, Boyd, and Bridgeport departments. While Boyd is nearest to Rhome, Officer Moore knew their K-9 would be unavailable because of the inclement weather. He instead requested the next closest unit in Bridgeport, which he testified took an average of twenty minutes to arrive in *good* weather. After his dispatch requests, Officer Moore again asked Saldana whether she knew Barrow was on federal parole. She responded, "I told you, I just met him." *Id.* at 15. Saldana also asserted that they drove to Fort Worth because Barrow's "uncle or cousin" recently died from COVID. *Id.* At this point, around twenty-eight minutes into the traffic stop, Officer Moore asked for consent to search the vehicle. Saldana denied consent.

Waiting for dispatch to respond to his requests, Officer Moore returned to the Camaro's driver's side to speak more with Barrow, whose answers differed from Saldana's. Barrow claimed he visits Fort Worth twice a month, and the purpose of the present trip was to visit his mother and uncle and to report to his probation officer. He identified Saldana as a police officer, but when Officer Moore explained she was no longer an officer, Barrow responded, "I know she has lawyers and stuff on that." *Id.* at 19. Officer Moore then explained to Barrow the VIN and license plate issues, to which Barrow explained, "We just got this taken care of in Amarillo." *Id.* at 20. When asked why they pulled into the second gas station, Barrow contended it was not gasoline, but to comply with the patrol lights Officer Moore activated. When Officer Moore asked Saldana again about the reason for driving towards the second gas station, she changed her answer. She asserted they did not need more gas but were trying to get back to Amarillo — via a circuitous route that departed from the Highway 287 that connected Amarillo to Fort Worth. *Id.* at 22.

Throughout these conversations, Officer Moore communicated with dispatch to locate the nearest available K-9 unit. Thirty minutes into the stop, Officer Moore told dispatch that if

Bridgeport had not yet responded, they should contact Boyd to ascertain K-9 availability in inclement weather. *Id.* at 18. Thirty-five minutes into the traffic stop, the dispatcher stated the Bridgeport unit would arrive in approximately twenty-five minutes. Officer Moore informed Codefendants he was waiting for the K-9 to arrive because of his reasonable suspicion that the Camaro contained narcotics, and that he was still waiting for a contact at Amarillo College. *Id.* at 23. He again explained his concern with both the license plate and Saldana providing police identification. While waiting, Officer Moore showed Saldana the database results revealing a different vehicle with no insurance. At this point, neither Saldana nor Officer Moore realized he had incorrectly keyed the license plate number.

Forty-four minutes into the stop, Officer Moore learned from dispatch that Boyd, the closer K-9 unit, received permission to bring their K-9 to the scene despite their weather restrictions. *Id.* at 26. He continued to call the College and the Amarillo Police Department, seeking a point of contact. Approximately fifty-one minutes into the stop, the K-9 arrived on scene, performed a sniff test of the Camaro, and alerted to the presence of narcotics. The officers conducted a probable cause search of the vehicle. They seized $15,000 in cash, a small bag of suspected methamphetamine from the glove compartment, a shoebox filled with methamphetamine, and $2,000 cash from the trunk. ECF No. 59 at 17. The gross weight of the suspected methamphetamine was 8.8 pounds, and the Drug Enforcement Administration laboratory later confirmed the substance was in fact methamphetamine. *Id.* at 18.

## II.     Procedural History

The three-count Superseding Indictment in this case charges Codefendants with: (1) Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of Methamphetamine, in violation of 21 U.S.C. § 846; (2) Distribution with Possession and Intent to

Distribute 500 Grams and More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) (charged against Barrow only); and Possession with Intent to Distribute 500 Grams and More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii). ECF No. 3. Codefendants moved to suppress all evidence, including all statements and "alleged contraband," and the Government responded in opposition. ECF Nos. 57, 59. The Court conducted a suppression hearing on November 30, 2022, with the Government and both Codefendants and their attorneys present. At the close of the hearing, the Court took the Motion under advisement.

### III.    Legal Analysis

A long line of cases governs how the Fourth Amendment's prohibition of "unreasonable searches and seizures" applies to traffic stops. U.S. CONST. amend. IV. The Supreme Court and the Fifth Circuit treat routine traffic stops as *Terry* stops. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). The *Terry* analysis consists of two parts: (1) an examination of whether the officer's actions were justified at their inception; and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). In all circumstances, though, the "ultimate touchstone" of the Fourth Amendment is "reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006).

Codefendants' Motion alleges two Fourth Amendment violations warranting suppression of evidence. First, they alleged "[t]he initial seizure/traffic stop was not supported by reasonable suspicion or an objectively reasonable basis." Second, they argue "Officer Moore improperly extended the traffic stop." ECF No 57 at 2–3. Codefendants' two claims implicate both steps of the *Terry* analysis, which the Court will address in turn, taking into consideration the facts of this case and all relevant case law.

a.     **The Initial Stop**

Codefendants claim Officer Moore's decision to stop the Camaro "was not supported by reasonable suspicion or an objectively reasonable basis." ECF No. 57 at 2. The Government responds that Officer Moore had the requisite reasonable suspicion for two reasons: (1) there was no front license plate on the Camaro; and (2) the Officer had an objectively reasonable belief that the Camaro was uninsured. ECF No. 59 at 18–27.

The initial stop was justified because Officer Moore had reasonable suspicion that Codefendants committed a traffic violation for not possessing a front license plate. "A traffic stop is justified at its inception if an officer has an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred or is about to occur, before stopping the vehicle." *United States v. Wallstrum*, 515 F. App'x 343, 348 (5th Cir. 2013) (internal quotations omitted). Officer Moore testified that upon arriving at the Big Z parking lot, he noticed a silver Chevrolet Camaro lacked a front license plate — in violation of Texas Transportation Code Section 504.943 and Texas Administrative Code, Title 43, Part 10, Chapter 217. *See* Exh. 5. While Codefendants' Motion asserts "Defendant Barrow did not violate Texas traffic law," Officer Moore's testimony and the exhibits at the hearing indicate otherwise — the front of the Camaro *was* missing a license plate, as required by state law. ECF No. 59 at 2.

Defense Counsel repeatedly notes that at no time during the stop did Officer Moore disclose to Codefendants that the missing front license plate was a reason for the stop. Rather, he identified only the insurance issue at the scene, but subsequently noted the front license plate violation in his police report. However, there is no requirement that law enforcement immediately inform drivers of each and every traffic violation. In fact, Officer Moore testified that withholding the disclosure of an infraction can be an intentional, tactical decision. In his twenty-two years of

law enforcement, he adopted the occasional strategy of not identifying to the driver *every* reason for the stop. He provided the following example to explain his strategy: if he stopped a vehicle for both speeding and a missing front license plate, he may only disclose the speeding violation. If he suspects the driver may be planning to commit another crime, such as narcotics trafficking, he could use the other, non-identified reason to stop the vehicle on the return trip. Such a circumstance would arise, he explained, if he noticed the vehicle coming and going from a location where suspected narcotics trafficking occurs.

Officer Moore further testified, under oath, that no other person instructed him to add the front license plate violation in his police report. Rather, his report was entirely from his own recollection of the night in question. Codefendants assert that because Officer Moore never vocalized the front license plate violation on the body camera footage, it "was not a factor considered by Officer Moore for the initial detention." ECF No. 57 at 8. But this level of speculation into the mind and motives of law enforcement is opposite of binding case law. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 811–13 (1996) (holding courts must not scrutinize an officer's motives behind his otherwise permissible actions). Officer Moore was not required to disclose the front license plate issue as *one* of his reasons for the traffic stop. The Court accepts Officer Moore's sworn testimony and the suppression hearing exhibits, both of which indicate Codefendants committed a traffic violation, regardless of whether Officer Moore vocalized it during the stop.

The initial stop was justified for a second reason — Officer Moore's inadvertent mistyping of the plate number into the police database was an objectively reasonable mistake. The Supreme Court explained that "a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake." *Heien v. North Carolina*, 574 U.S. 54, 57, 66 (2014).

"An officer might, for example, stop a motorist for traveling alone in a high-occupancy vehicle lane, only to discover upon approaching the car that two children are slumped over asleep in the back seat. The driver has not violated the law, but neither has the officer violated the Fourth Amendment." *Id.* "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Id.* at 60. Here, Officer Moore entered the license plate number into the police database while circling the Camaro at the Big Z gas station. In doing so, he transposed the middle two numeric digits and inverted[5] one of those digits — entering LPV5652 instead of LPV5262. His negligence typing in the information led him to mistakenly believe the Camaro was uninsured. Officer Moore testified that he did not realize his error until the next day when he finalized his report.

In assessing an officer's objective reasonableness, the Court must take the totality of the circumstances into account. *United States v. De Leon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curium). Other courts have addressed the issue of officers misreading license plates and still found reasonable suspicion to justify a traffic stop. In *United States v. Jones*, the district court found it an objectively reasonable mistake when agents mistook the letter "I" for the number "1" on the vehicle's plate. No. L-12-10, 2012 WL 1309837, at *6 (S.D. Tex. Apr. 16, 2012). While it was nighttime and the agents' car was in motion, they "got close enough" to the vehicle that "they thought they could read the plate." *Id.* Therefore, there was little reason for them to believe they had made a mistake. Similar conditions existed here. While it was dark and his vehicle was in motion when Officer Moore input the license number, he nevertheless was relatively close to

---

[5] Officer Moore testified that his computer screen displays in "digital" font. Therefore, numbers 2 and 5 look the same when inverted.

the vehicle — about fifteen feet or so, according to his testimony. He therefore had no reason to believe he had made a mistake when first deciding to detain the Camaro.

Fifth Circuit cases have also held similar mistakes objectively reasonable. In *United States v. Montes-Hernandez*, the Fifth Circuit found reasonable the officer's mistaken belief that the license-plate frame impermissibly obscured half of the issuing state's name, even though it obscured less than half. 350 F. App'x 862, 867–68 (5th Cir. 2009). The facts in *De Leon-Reyna* are even closer. There, the agent read a license plate to his dispatcher, who responded that the plate was issued to a different vehicle. 930 F.2d at 398. In reading the plate, however, the agent failed to use his unit's "code word" policy — e.g., Alpha, Bravo, Charlie — to better articulate the letters of the plate. The results were erroneous because the dispatcher misunderstood him to say "N" instead of "M." The Fifth Circuit found that "regardless of whether [the agent] was negligent in failing to follow his unit's code word policy, his good faith reliance on the license report information . . . was objectively reasonable." *Id.* at 399.

The Court also found the agent in that case had not only good faith reliance on the plate information in his decision to stop the vehicle, but also weighed the "additional surrounding circumstances" that criminal activity may be afoot based on his training and experience in the same area in Texas. *Id.* Here, Officer Moore was informed by twenty-two years of law enforcement experience that Route 287 was a common drug-trafficking corridor. He was also aware that the historic winter storm made it odd for a sports car to drive at night during Snow-Mageddon. *See* Louie Bond, *Snow-Magaeddon: Looking Back at Winter Storm Uri, One Year Later*, TEX. PARKS & WILDLIFE (Feb. 2022). He testified that most of the vehicles on the road were semi-trucks or other larger vehicles with 4x4 drive, and that traffic was much lighter than normal due to the poor conditions.

Officer Moore also noted that the Camaro did not merge back onto Highway 287 after exiting the Big Z parking lot. Rather, it headed towards another gas station, the Love's Travel Stop. The Officer testified that this behavior is indicative of defendants attempting to avoid law enforcement — based on his training and experience. Because Officer Moore's marked patrol vehicle followed the Camaro as it exited the Big Z, he believed the Camaro was attempting to avoid or evade him by traveling to the nearby gas station — despite having just been at a gas station — upon noticing his presence. These observations, his good faith reliance on his mistake of fact, and the Camaro's license plate violation all provided Officer Moore with "reasonable suspicion" to conduct the initial traffic stop. Consequently, the Officer's actions were justified at their inception. *Terry*, 392 U.S. at 19–20.

### b. The Extension of the Stop

Next, Codefendants aver contend the stop was unconstitutionally extended. ECF No. 57 at 3. The Government responds that Officer Moore developed *additional* reasonable suspicion that warranted extending the stop. ECF No. 59 at 27. The Court must assess whether Officer Moore's mistaken belief about the license plate continued to be reasonable, and whether "the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Terry*, 392 U.S. at 19–20. In doing so, the Court must "consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers" — here, Officer Moore — to determine whether the actions and "length of the detention" were reasonable under the circumstances. *Brigham*, 382 F.3d at 506.

Officer Moore immediately informed Codefendants of the insurance issue and promptly entered the VIN into his dash-mounted computer and database. Codefendants assert that because the VIN matched the vehicle and showed insurance, the purpose for the stop was resolved and

therefore Codefendants "should be allowed to leave." ECF No. 57 at 9. But Officer Moore testified that the conflicting VIN and plate results presented additional questions. He needed to dispel whether the license plate was stolen or if a "VIN swap"[6] occurred. He continued investigating, asking Codefendants about the vehicle's history and repeatedly explaining the database's confusing results.

Importantly, the answers Codefendants offered him regarding the vehicle provided no reason to believe he had made a mistake. *See Jones*, 2012 WL 1309837, at *6. The first thing either Codefendant said to Officer Moore was a confirmation that the insurance had been recently updated. Exh. 6 at 1. He also learned the pair were traveling from Fort Worth — the same city where the database told him the cancelled plate had been registered. Furthermore, later in the stop, Barrow told the Officer, "We just got [the insurance] taken care of in Amarillo." *Id.* at 20. Because they indicated something was *recently* wrong with their insurance or plates, Officer Moore had little reason to think he had input the numbers incorrectly — and therefore believed the insurance continued to pose a problem.

Even though Officer Moore did not discover his mistake during the stop, the surrounding circumstances made his continuing mistake of fact objectively reasonable. As other suspicious circumstances arose during the stop, indicating Codefendants may be engaged in criminal activity, Officer Moore had increasing reason to believe something was wrong with the license plate. He testified that VIN swaps and license-plate theft are common in drug trafficking and other criminal activity. Codefendants' are certainly correct that Officer Moore could have resolved the issue by "simply reentering the license plate information correctly" (ECF No. 57 at 9). The Supreme Court has, however, cautioned against such second-guessing because "post hoc evaluation of police

---

[6] Officer Moore testified that a VIN swap occurs when criminals exchange a VIN on a stollen car so that it reports as not stollen.

13

conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985).

Officer Moore's "investigative methods were reasonable" and "proceeded with deliberation in response to evolving conditions." *Brigham*, 382 F.3d at 511. Although he asked Codefendants about their travel plans in their initial conversation, such questions are permissible during a traffic stop. *Id.* at 508. Mere questioning is not a Fourth Amendment seizure. *Id.* Additionally, the Officer asked these questions in the midst of his continuing investigation into the conflicting insurance results, as his reasonable suspicion had not yet been dispelled. Because the Fourth Amendment permits an officer to "undertake similar questioning of the vehicle's occupants to verify the information provided by the driver," Officer Moore was within his means to separately question both Saldana and Barrow to confirm their answers aligned. *Id.*

"Equally within the legitimate scope of the stop were . . . the license checks" the Officer initiated on the vehicle's occupants. *Id.* at 509. "This procedure would have been permissible even without the additional information he gleaned, which led to a reasonable suspicion" there might be something fraudulent with the license plate or VIN. *Id.* After the incompatible VIN results, Officer Moore contacted dispatch to relay Codefendants' driver license numbers. Through dispatch, he learned Barrow had a criminal history and was currently on federal parole for narcotics violations.

Within fifteen minutes of the stop, Officer Moore had several indicators of criminal activity *beyond* his initial reasonable suspicion that the Camaro was traveling without insurance and a front license plate. Notably, the Supreme Court has emphasized that courts must allow law enforcement officers "to draw on their own experience and specialized training to make inferences from and

14

deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

At this point in the stop, Officer Moore weighed the following factors in assessing the totality of the circumstances: (1) the sports car was traveling in the dark, during the worst storm in recent Texas history; (2) the car had been traveling on a known drug-trafficking corridor; (3) upon exiting the Big Z parking lot, the Camaro drove towards *another* gas station rather than merging back onto Highway 287; (4) even though Codefendants told the Officer they were heading back to Amarillo, they had not returned to Highway 287, which is a far faster route than the one they elected; (5) Codefendants were traveling to and from Fort Worth in one day, which constitutes approximately ten hours of driving in terrible weather conditions; (6) Officer Moore knew from his experience that one-day trips were common when trafficking drugs; (7) Codefendants had increasingly inconsistent stories about the purpose for their travel; (8) Officer Moore identified Barrow's neighborhood, from which they were traveling, as a "high crime" area; (9) Saldana could not remember where in Fort Worth they traveled, nor which of Barrow's relatives they traveled to see; (10) Barrow had a lengthy criminal history and was currently on federal parole for narcotics trafficking; (11) despite dating Barrow for a few months, Saldana did not know whether he had ever been in legal trouble; and (12) Codefendants stated to the Officer that they recently dealt with the insurance issue. Theses discrepancies "gave cause for further inquiry." *Brigham*, 382 F.3d at 511.

Sixteen minutes into the stop, however, Officer Moore developed reasonable suspicion of *additional* crimes. Saldana seemingly committed a third-degree felony in Officer Moore's presence. She stated, unprovoked, "I'm actually a police officer in Amarillo." Exh. 6 at 7. At the suppression hearing, Corporal Derek Judd of the Amarillo College Police Department testified that

15

Saldana had not been an officer since May 2020. Nevertheless, Saldana procured for Officer Moore an Amarillo College identification card labeled "Police Officer." Exh. 10. Officer Moore testified that Impersonating a Public Servant was a violation for Texas Penal Code Section 37.11, and False Identification as a Peace Officer was a violation of Texas Penal Code Section 37.12. If additional reasonable suspicion arises during a traffic stop, before the initial purpose of the stop has been fulfilled, then an officer can extend the detention until the new reasonable suspicion has been dispelled or confirmed. *United States v. Jensen*, 462 F.3d 399, 404 (5th Cir. 2006). While Officer Moore had reasonable suspicion to extend the stop for the first fifteen minutes, he launched an additional investigation into these potential crimes as well.

Only *after* Saldana was unable to provide any further identification as a police officer did Officer Moore contact dispatch to request a K-9 unit. Exh. 6 at 12. He simultaneously requested a point of contact at Amarillo College, conveying that he was pursing multiple investigations into criminal activity. Officer Moore testified at the hearing that he was concerned that her false identification as an officer was an attempt to receive a "professional courtesy" — because she was a fellow police officer, Officer Moore would simply let them leave. Furthermore, he found it suspicious that a proclaimed law enforcement officer would be dating someone on federal parole, and that she could not provide him with identifying information officers were typically required to know. These new circumstances, when combined with the earlier suspicious circumstances, led Officer Moore to believe he had reasonable suspicion to contact a K-9 unit to inspect the Camaro and to continue detaining Codefendants.

The fact that the traffic stop lasted just under an hour does not, in itself, violate the Fourth Amendment. There is no constitutional stopwatch on traffic stops. *Brigham*, 382 F.3d at 511. "Instead, the relevant question in assessing whether a detention extends beyond a reasonable

duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Id.* (quoting *Sharpe*, 470 U.S. at 686). Here, Officer Moore was diligent in attempting to secure a K-9 unit and contact with the College as soon as possible. While the weather initially rendered the nearest K-9 unavailable, Officer Moore requested the unit seek *special* permission to travel to the scene. Because of his efforts, the nearest unit in Boyd eventually received permission to travel. Additionally, Officer Moore and his team made several attempts to contact the College, which was also shuttered due to inclement weather. While waiting for both of those requests, he continued his investigation on scene.

The inconsistencies between Saldana and Barrow's answers continued to grow. Codefendants' "inconsistencies and evasions created suspicion, requiring further detective efforts." *Id.* at 510. By this Court's assessment, there were at least ten inconsistencies between Codefendants' statements: (1) Barrow claimed he still lived in Fort Worth, but later said he only visits the city twice a month; (2) Saldana stated that she and Barrow had been dating for months, but then claimed she "just met him"; (3) Saldana initially said they traveled to Fort Worth to see Barrow's brother, but later claimed it was because his uncle just died after "he got a COVID shot," and then claimed it was because his "uncle or cousin" died; (4) Barrow identified the reason for the trip as visiting his mom, uncle, and reporting to parole — never mentioning a family death; (5) Saldana claimed to be a police officer, but then asserted she stated she *used* to be a police officer; (6) Barrow also identified Saldana as a police officer, and when confronted with the truth, stated he knew she "had lawyers and stuff on that"; (7) despite being a police officer for six years, Saldana did not know any of her identifying numbers, nor any point of contact at the College; (8) Saldana explained they traveled to the Love's gas station because they had not filled the gas tank at the Big Z station. Barrow denied traveling to the second station for more gas, explaining

17

he filled the tank at Big Z. Saldana later changed her story, claiming they already filled their tank and "weren't coming here to get gas"; (9) while Saldana was quick to identify herself as an officer, when asked the reason for her discharge, she asserted it was "personal"; and (10) Codefendants claimed they were returning to Amarillo, but elected to take a circuitous route. In sum, Officer Moore "had a right to rely on his experience in concluding that such actions indicate that an individual may be lying." *Id.* at 508.

Because of Officer Moore's diligence in investigating his reasonable suspicion, though it was initially mistaken, the traffic stop was not improperly extended. It also was not improperly extended when additional reasonable suspicion arose, and Officer Moore employed new investigative techniques to dispel or confirm that new suspicion. That the Officer simply could re-enter the license plate again is "an easy conjecture in hindsight," and it does not consider the totality of all other circumstances that dissuaded him from considering whether he made a mistake, nor the additional reasonable suspicion that developed throughout the stop. *Id.*

Because the Officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop, it was not unlawfully extended during the first fifteen minutes. *Terry*, 392 U.S. at 19–20. Furthermore, because he "reasonably proceeded with deliberation in response to evolving conditions" in order "to dispel[] his reasonable suspicion [that] developed during the stop," the extension was not unlawfully extended after the sixteen-minute mark. *Brigham*, 382 F.3d at 507, 511. Again, there is no constitutional stopwatch on traffic stops. *Id.* at 511. Officer Moore diligently pursued his investigation, particularly in light of the historic Snow-Mageddon limiting his access to typically-available resources. *Id.*

Everyone makes mistakes. Officer Moore made a mistake when he typed in the wrong license plate number. But some mistakes by law enforcement are reasonable and therefore not in

18

violation of the Fourth Amendment. Because the two-part analysis in *Terry* is satisfied, and because the Officer relied on his reasonable mistake in good faith, the exclusionary rule does not apply in this case.

### IV.    Conclusion

Because the Government has met its burden to show the traffic stop was constitutional at its initiation and at its extension, the Court **DENIES** Codefendants' Motion.

**SO ORDERED.**

December **8**, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE