```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE NORTHERN DISTRICT OF TEXAS

 3                        AMARILLO DIVISION

 4   UNITED STATES OF AMERICA,     )   2:22-cr-00042-Z-BR-1
                                   )
 5              Government,        )
                                   )
 6   VS.                           )   Thursday, January 18, 2024
                                   )   1:46 p.m. - 4:20 p.m.
 7   MANDIS CHARLES BARROW,        )
                                   )
 8              Defendant.         )   SENTENCING HEARING

 9

10                   TRANSCRIPT OF PROCEEDINGS

11          BEFORE THE HONORABLE MATTHEW J. KACSMARYK

12               UNITED STATES DISTRICT JUDGE

13

14   A P P E A R A N C E S:

15   FOR THE GOVERNMENT:       UNITED STATES ATTORNEY'S OFFICE
                               BY:  ANNA MARIE BELL, AUSA
16                             500 South Taylor Street, Suite 300
                               Amarillo, Texas 79101
17

18   FOR THE DEFENDANT:        UNDERWOOD LAW FIRM
                               BY:  SLATER ELZA, ESQ.
19                             PO Box 9158
                               Amarillo, Texas 79105
20

21   COURT REPORTER:           SHAYNA MONTGOMERY, CSR, RMR, CRR
                               United States Court Reporter
22                             205 SE 5th Ave, Room 133
                               Amarillo, Texas 79101
23                             (806) 468-3816

24
     Proceedings reported by mechanical stenography and transcript
25   produced by computer.
```

1              P R O C E E D I N G S

2          THE COURT:  The Court calls Criminal Action Number

3    2:22-cr-042-Z-BR-1, United States of America vs. Mandis Charles

4    Barrow, for sentencing.

5          Are the parties ready to proceed?

6          MS. BELL:  The United States is ready, Your Honor.

7          MR. ELZA:  Slater Elza with the Underwood Law Firm

8    here on behalf of Mr. Barrow and we're ready to proceed.

9          THE COURT:  Counsel for the United States is present.

10    Counsel for defendant Mandis Charles Barrow is present.

11          Mr. Barrow, please acknowledge your presence in court

12    today by stating your full name for the record.

13          THE DEFENDANT:  Mandis Charles Barrow.

14          THE COURT:  Mr. Barrow, you may participate in this

15    hearing seated or standing, whatever is most comfortable and

16    consistent with the advice of counsel.

17          The Court will make an announcement of its tentative

18    determination on the pending motion for downward variance and

19    then we'll proceed with sentencing.

20          The Court did review defendant's sentencing

21    memorandum and request for downward variance set forth in

22    Document Number 165.  Based on the information contained in the

23    PSR and the addendum, the Court has tentatively determined that

24    a nonguidelines downward variance is not sufficient pursuant to

25    the factors set forth at 18 U.S.C. Section 3553(a), but the

1    Court did make this announcement of its tentative determination

2    to allow the parties adequate opportunity to respond with

3    argument and additional information.  The time to do so is

4    after the Court calculates and announces the advisory

5    guidelines range.  We will then take up any variance issues at

6    that time.

7            Now, Mr. Barrow, you appeared before this Court for a

8    criminal trial on September 5th, 2023.  On September 7, 2023,

9    you were convicted by a jury of your peers on three counts:

10   Number one, conspiracy to distribute and possess with intent to

11   distribute 500 grams or more of methamphetamine, in violation

12   of 21 U.S.C. Section 846; Number two, distribution and

13   possession with intent to distribute 500 grams or more of

14   methamphetamine, in violation of 21 U.S.C. Sections 841(a)(1)

15   and 841(b)(1)(A)(viii), that's viii; Number three, possession

16   with intent to distribute 500 grams or more of methamphetamine,

17   in violation of 21 U.S.C. Sections 841(a)(1) and

18   841(b)(1)(A)(viii), also viii.

19           Now, Ms. Bell, did the Government receive a timely

20   copy of the PSR and addendum?

21           MS. BELL:  Yes, Your Honor.

22           THE COURT:  Other than the Government's written and

23   timely responses in Documents Number 161, 163 and 166, does the

24   Government have additional information, responses,

25   clarifications or arguments relevant to the PSR or addendum?

1          MS. BELL:  No, Your Honor.

2          THE COURT:  Does the Government adopt the facts and

3     conclusions set forth in the PSR as modified by that addendum?

4          MS. BELL:  Yes, Your Honor.

5          THE COURT:  Now, Mr. Elza, did you and your client

6     receive timely copies of both the PSR and addendum?

7          MR. ELZA:  Yes, Your Honor.

8          THE COURT:  And did you have a full and complete

9     opportunity to review the PSR and addendum with your client?

10         MR. ELZA:  Yes, Your Honor.

11         THE COURT:  And did you explain to your client how

12    the PSR and addendum work in this sentencing hearing?

13         MR. ELZA:  Yes, Your Honor.

14         THE COURT:  Are you confident that your client fully

15    understands both the PSR and addendum?

16         MR. ELZA:  Yes, Your Honor.

17         THE COURT:  Okay.  So there were a series of

18    timely-filed objections, and I am grouping those objections as

19    follows.  There are factual clarifications that are arguably

20    rendered moot by the addendum, and then there are a series of

21    other factual clarifications that may require findings of the

22    Court but do not otherwise affect -- or do not affect the

23    calculation of the advisory guidelines range.  And then there

24    is a third category of objections that could potentially affect

25    the calculation of the advisory guidelines range.  And we'll

1    take them up in those three groups.

2            So first, regarding defendant's Objections 13 and 14

3    requesting factual clarification, the Court has tentatively

4    determined that the information was corrected in the addendum

5    and that Objections 13 and 14 are now mooted by that addendum.

6            Mr. Elza, do you agree that the addendum corrected

7    the information in Objections 13 and 14 and they are thereby

8    mooted?

9            MR. ELZA:  Yes, Your Honor.

10           THE COURT:  And does the Government agree that the

11    addendum adequately addressed Objections 13 and 14 and that

12    those objections are now moot?

13           MS. BELL:  Yes, Your Honor.

14           THE COURT:  Okay.  The Court so rules.  Objections 13

15    and 14 are mooted by the addendum.

16           Next, also in the category of factual clarifications

17    but not clarifications that would affect the calculation of the

18    advisory range, Objections 1, 2, 4, 10, 11 and 12 requesting

19    factual clarification not rendered moot by the addendum.

20           Mr. Elza, does the defendant continue to urge these

21    factual clarifications?

22           MR. ELZA:  He does, Your Honor.

23           THE COURT:  Okay.  So I have further grouped those

24    objections by category.  I will list for counsel the relevant

25    categories which should include five matters of factual

1    clarification.  First, defendant's argument about inconsistent

2    stories during the Rhome traffic stop.  And here, I'm

3    referencing the Texas city of Rhome, R-H-O-M-E.  Next, the

4    facts relevant to multiple backpacks that were or were not

5    delivered to Vincent Chavez, Jr.  Next, facts relevant to

6    whether defendant did or did not enlist Vincent Chavez, Jr.

7    Next, facts relevant to defendant's failure to report at least

8    as set forth in the PSR.  And finally, objections relevant to a

9    factual clarification specific to the Tulia drug bust as it's

10   described by defendant.

11          So this'll be a lengthy set of tentative

12   determinations on each of those factual clarifications.  I'll

13   instruct counsel for the Government and defendant to take good

14   notes.  I will provide you my factual -- I'll provide you my

15   tentative ruling on each factual determination, and then after

16   all are done, invite responsive argument.  I'll just instruct

17   counsel to keep close notes since there are multiple

18   objections, multiple paragraphs and multiple analyses at issue.

19          I will read into the record my tentative

20   determination on all of these factual clarification categories,

21   then invite argument.  If at any time you need the Court to

22   slow down so you can take better notes, please signal to my

23   courtroom deputy and I'll make certain that I make the

24   necessary accomodation.

25          So first category of factual clarification relevant

1    to inconsistent stories during the Rhome traffic stop, this is

2    relevant to defendant's timely-filed Objection 1 to PSR

3    paragraph 7 which stated that defendant and his codefendant

4    gave inconsistent statements during a traffic stop in Rhome,

5    Texas, specifically that this PSR paragraph 7 states that

6    these, quote, "stories" differed in several ways, including the

7    reason for their trip when they got gas and drinks and why they

8    went from one gas station to another.

9           The Court has tentatively determined it should

10    overrule defendant's Objection 1 for the following reasons.

11           This Court has already adjudicated the alleged

12    inconsistency of statements made during the Rhome traffic stop.

13    Quoting from this Court's order on the motion to suppress in

14    Document Number 65, quote, "By this Court's assessment, there

15    were at least ten inconsistencies between codefendant's

16    statements.  Saldana explained they traveled to the Love's gas

17    station because they had not filled the gas tank at the Big Z

18    station.  Barrow denied traveling to the second station for

19    more gas, explaining he filled the tank at Big Z.  Saldana

20    later changed her story claiming they already filled their tank

21    and weren't coming to get gas."  And it goes on to note other

22    inconsistencies.

23           The Court finds that the information contained in the

24    PSR does bear sufficient indicia of reliability for this Court

25    to use at sentencing and that the defendant has not overcome

1  that indicia of reliability by merely arguing that, quote,

2  "arresting" -- "the arresting officer was clear on multiple

3  occasions that the stories of the defendants were similar."

4  The Court is guided by United States vs. Solis, 299 F.3d 420, a

5  Fifth Circuit case from 2002 that explains that mere objections

6  do not suffice as competent rebuttal evidence; United States

7  vs. Cabrera, 288 F.3d 163; and United States vs. Washington, 48

8  F.3d 309 holding same.

9          Even if the PSR did not bear sufficient indicia of

10  reliability, this Court would still overrule defendant's

11  objections based on this Court's review of the video of the

12  traffic stop and this Court's hearing of testimony by the

13  arresting officer at trial and at the hearing on suppression,

14  all of which support the PSR writer's conclusion in paragraph 7

15  that codefendants did provide inconsistent reasons for stopping

16  at the Love's travel center.

17          Next category, the multiple backpacks delivered to

18  Vincent Chavez, Jr.  This pertains or at least correlates to

19  Objection 2 to PSR paragraph 14 which states that defendant

20  took multiple backpacks to Vincent Chavez, Jr.'s house.  The

21  Court has tentatively determined that it should overrule

22  defendant's Objection Number 2 because the information was

23  received from otherwise reliable sources, and defendant's

24  objections are insufficient to overcome the general rule that

25  information contained in the PSR bear sufficient indicia of

1    reliability.

2              As with the last objection, the Court here is guided

3    by the Solis, Cabrera and Washington cases explaining that mere

4    objections do not suffice as competent rebuttal evidence.

5    Additionally, that PSR paragraph 14 states that the defendant

6    admitted he took backpacks to Chavez, Jr. and must be weighed

7    alongside PSR paragraph 13 which states that the Drug

8    Enforcement Agency discovered two backpacks containing

9    narcotics in Chavez, Jr.'s residence.  Defendant is incorrect

10   to assert that there is no factual basis for this statement and

11   that it is incorrect.

12             The Court is also relying on its presence in

13   presiding over the suppression hearing and trial, and by the

14   Court's recollection, PSR paragraph 14 and 13 accurately

15   summarize testimony that at all times was subject to

16   cross-examination.

17             The Court overrules defendant's Objection 2 to PSR

18   paragraph 14.

19             Number three, whether defendant enlisted or did not

20   enlist Vincent Chavez, Jr.  This correlates to defendant's

21   Objection 4 to PSR paragraph 18 which states that defendant,

22   quote, "enlisted Vincent Chavez, Jr. to engage in illicit

23   conduct."  The Court has tentatively decided that it should

24   overrule defendant's Objection Number 4 because the information

25   contained in PSR paragraph 18 was derived from otherwise

1    reliable sources, and it is consistent with testimony presented

2    during the defendant's trial and is further supported by

3    exhibits presented by the Government through its papers filed

4    ahead of this sentencing hearing.

5            Here, defendant centers his objection on the

6    undisputed fact that law enforcement had been investigating

7    Vincent Chavez since at least April 2020 and that defendant was

8    in custody from 2011 until September 2020.  This is reflected

9    in Document Number 162 at page 2.  From that, defendant argues

10   he could not have enlisted Vincent Chavez, Jr. in any illicit

11   conduct because Chavez was involved in the DTO -- by "DTO" the

12   Court at all times means "Drug Trafficking Organization" --

13   before the defendant was released from prison.

14           But this argument misunderstands the meaning of the

15   verb "enlist," which merely means, quote, "to secure the

16   support in aid of" or, quote, "employ or utilize in advancing

17   some interest."  Here, the Court is quoting directly from

18   Webster's Third New International Dictionary, the 1981 edition.

19           Here, there is ample evidence that defendant employed

20   and utilized the support of Vincent Chavez, Jr. in illicit

21   activities.  As outlined in the Government's brief, Vincent

22   Chavez, Jr. admitted to acting as a, quote, "runner" for

23   defendant and Victor Chavez.  This is -- this is -- this finds

24   evidentiary support in Document Number 163 at page 10 citing

25   Exhibit A.

1          Additionally, Chavez also stated he was storing drugs

2    for defendant, which were ultimately recovered by law

3    enforcement.  DEA officers also observed Chavez sell

4    methamphetamine, which Chavez claims to have only done with the

5    permission of defendant.  Chavez also described himself as a

6    quote, "middleman" between defendant and the distributors.

7    While defendant may be correct that he was not the first person

8    to recruit Vincent Chavez, Jr. into illicit activity, the PSR,

9    the suppression hearing, defendant's trial and the exhibits

10   produced by the Government, which this Court reviewed from

11   start to finish, contain ample evidence that defendant did

12   enlist the help of Vincent Chavez, Jr. to traffic narcotics in

13   furtherance of the instant offense, at least as that term is

14   properly applied in this sentencing context.

15          Next, here, this is Factual Clarification Category 4,

16   the alleged failure to report.  Here, defendant's Objection

17   Number 10 relates to PSR paragraph 41 stating that defendant

18   missed some tests due to memory issues but nonetheless

19   proactively worked with his probation officer to test after

20   missing these tests.  The Court has tentatively determined it

21   should overrule defendant's Objection 10 because defendant has

22   produced no evidence or argument that the information described

23   in PSR paragraph 41 is incorrect.

24          Instead, defendant asserts reasons for missing drug

25   testing appointments, but as noted in the addendum, quote,

1    "Regardless of defendant's reasoning behind his failure to

2    comply with conditions of supervised release, he nonetheless

3    committed these technical violations."  Here, defendant makes

4    no argument he did not commit the technical violations

5    described in that PSR paragraph 41.  Even if he had, the

6    technical violations described therein were obtained from

7    otherwise reliable sources, and the probation officer further

8    supplemented those conclusions in the addendum that followed.

9    That addendum stated that defendant failed to report for drug

10   testing on October 8 and 23 of 2020; December 10, 2020; and

11   January 8, 2021.  Using the aforementioned Solis, Cabrera and

12   Washington cases as guideposts, this Court finds that PSR

13   paragraph 41 bears sufficient indicia of reliability for use at

14   sentencing.

15              Next, and this would be the fifth factual

16   clarification category, the dismissed charges are what

17   defendant and counsel have referred to as the Tulia drug bust,

18   and that is spelled T-U-L-I-A.  This pertains to defendant's

19   Objections 11 and 12 to PSR paragraphs 50, 51 and 52.  Those

20   paragraphs describe charges that were dismissed against

21   defendant.  And for clarification, one of the dismissed charges

22   is not Tulia, although other -- other parts of that paragraph

23   are a direct reference to the Tulia investigation.

24              The Court has tentatively decided it should overrule

25   defendant's objections because the information described in PSR

1    paragraphs 50, 51 and 52 were obtained from otherwise reliable

2    sources, and again, defendant has failed to marshal sufficient

3    evidence to overcome that indicia of reliability.

4         Specifically, defendant objects to these PSR

5    paragraphs asserting that the charges described in PSR

6    paragraph 50 and 51 were dismissed when authorities determined

7    defendant was not the person involved in criminal conduct and

8    asserts that the charges described in PSR paragraph 52 were

9    dismissed when, quote, "Authorities determined that the

10    narcotics agent Tom Coleman had perjured himself, compromising

11    over 40 criminal cases."

12         While these PSR paragraphs do state that the charges

13    against defendant were dismissed, this Court has not received

14    or reviewed any evidence or documentation from defendant

15    showing the reasons for the dismissal.  Here, the probation

16    officers learned of the charge through a rap sheet that was

17    made available to the officer in anticipation of the PSR.

18    That's reflected in the following addendum.

19         Although the officer did request additional details

20    about these three arrests, those requests remain unfulfilled as

21    of the instant date, and because the probation officer did not

22    receive additional documentation showing the reason for those

23    case dismissals and because defendant has failed to marshal any

24    evidence supporting his bare assertions, this Court has decided

25    to overrule defendant's Objections 11 and 12 as they pertain to

1    PSR paragraphs 50, 51 and 52.

2            Now, in reaching these tentative determinations in

3    these five categories, the Court at all times was guided by its

4    recollection and observation of testimony and evidence adduced

5    at the suppression hearing and at trial, and for all of the

6    aforementioned reasons, the Court is overruling -- or has

7    tentatively determined to overrule defendant's Objection 1, 2,

8    4, 10, 11 and 12 for the aforementioned reasons.

9            At this time, I'll invite responsive argument or

10   information that is not cumulative of the extensive written

11   briefing already submitted to the Court.

12           Ms. Bell, you may proceed.

13           MS. BELL:  Nothing outside the written submissions,

14   Your Honor.

15           THE COURT:  And, Mr. Elza, you may proceed with any

16   additional information or argument that would not be

17   cumulative.

18           MR. ELZA:  Okay, and I'll certainly attempt to not be

19   cumulative, really probably attempt to add some context in

20   here.

21           So on Objection Number 1 which related to PSR

22   paragraph 7, the position that Mr. Barrow takes is that there

23   was testimony that their stories were substantially similar.

24   The parts about the gas stations is we had two people talking

25   about three gas stations and a law enforcement talking about

1    two.  Those we just -- we do not think were inconsistent, and

2    we think that the paragraph in the PSR does not provide an

3    accurate reflection of what the evidence was at trial.

4            On Objection Number 2, which ties to paragraph 14,

5    understand and respect the Court's citation of the interview

6    from December that Mr. Barrow gave.  Mr. Barrow has provided

7    the Court today -- provided to counsel, which I forwarded to

8    the Court today, essentially a written allocution that talks

9    about that interview and why what he said was not true.  We

10   think that -- again, we acknowledge that he said it, but the

11   evidence in context we believe would be that there was no

12   delivery of one, much less two backpacks.  He did deny that in

13   his objection.

14           Moving on to 4, the Court cited to the reliance on

15   reliable testimony, and we would respectfully point out that

16   that is the words of Vincent, who was visibly upset and being

17   removed by arrest from his family and that what he said was

18   self-serving in an attempt to deflect blame from himself and is

19   not otherwise reliable.  There's no evidence that was ever

20   produced that I can remember of any type of phone call to

21   Mr. Barrow on that day.  Mr. Chavez, Jr. -- Vincent Chavez, Jr.

22   was a major drug player and higher-up in the DTO long before

23   Mr. Barrow was ever out of incarceration.

24           10, again, understand and respect the Court's

25   position on that and that there is, in fact, a technical

1    violation, and I think we -- we would look foolish to deny that

2    otherwise.  However, we believe that the added information

3    submitted by Mr. Barrow provides context to that, which is

4    important to understanding the information referenced in the

5    PSR.

6         And then moving to the combined Objections 11 and 12

7    which deal with paragraphs 50, 51 and 52, again, understand the

8    Court's position that we did not submit evidence on those.  I

9    think in fairness to our position, it sounds like the PSR

10   drafter attempted to find that information as well.

11   Historically, right or wrong, my position on those is when we

12   know information, even if it's anecdotally and can provide that

13   even if we don't have access to those records, we list those as

14   an objection or request for clarification or context to allow

15   for the opportunity for the PSR drafter to maybe be able to

16   find or confirm that information.  And that's why those

17   objections were included.

18        Again, it's my hope and my intention was not to be

19   cumulative.  We do adopt and incorporate our prior filed

20   objections, but I thought it was important just to address

21   those one or two issues on each of our objections.

22        THE COURT:  Any response from the Government to the

23   additional information or argument provided by defense counsel?

24        MS. BELL:  Your Honor, with regard to Objection

25   Number 1, my recollection of the testimony is that Mr. Elza

1    asked Ronnie Rapert whether or not there could have been a gas

2    station in Fort Worth that they had stopped at, and that

3    Mr. Rapert opined that there could have been but did not

4    testify that there was a third gas station.  And so there was

5    no evidence of a third gas station.

6              Your Honor, with regard to Objection Number 4, with

7    regard to what Vincent A. Chavez told law enforcement, that was

8    long before Mr. Barrow's arrest, Your Honor.  He gave an

9    interview, which is attached to the Government's response.

10   Your Honor, he gave a very gradual confession, Your Honor,

11   which is very typical, and he gave statements against his own

12   penal interest, Your Honor, that bear indicia of reliability.

13   And, in fact, he is serving prison time based on his -- the

14   evidence against him and his own statements that he made, Your

15   Honor.

16             I think that's it, Your Honor.  Thank you.

17             THE COURT:  Okay.  For the reasons previously stated

18   as the Court's tentative determination and supplemented by the

19   facts and arguments provided by the AUSA in response to defense

20   counsel's supplemental arguments, this Court adopts its

21   tentative determination as its final ruling and is basing that

22   ruling on Document Number 163 and the addendum, which the Court

23   incorporates by reference.

24             And the Court adopts the tentative finding as

25   supplemented by those documents and the arguments of the

1    Government as its final finding and hereby adopts the findings

2    and conclusions set forth in PSR paragraphs 7, 14, 18, 41, 50,

3    51 and 52 alongside the relevant addendum paragraphs, and this

4    Court thereby overrules defendant's Objections 1, 2, 4, 10, 11

5    and 12, none of which have a bearing on this Court's

6    calculation of the advisory guidelines range.

7            Now, in the third and final category of timely

8    objections submitted by defendant, the Court has grouped these

9    objections by category.  These do potentially affect the

10   calculation of the advisory guidelines range, and because they

11   will require lengthy adjudication by the Court, I will invite

12   any additional noncumulative information or argument after each

13   one.

14           So continue to take good notes, but I will pause

15   category by category as we go through these objections because

16   they do potentially affect this Court's calculation of the

17   advisory range.

18           Does defendant continue to urge the objections

19   affecting the guidelines calculations?

20           MR. ELZA:  He does, Your Honor.

21           THE COURT:  Okay.  So here, as we did in the last

22   category, I'll set forth the Court's tentative finding.  This

23   is -- the Court's analysis is based on defendant's written

24   objections in Document Number 162 and the Government's written

25   response in Document Number 163 and the addendum.

1    In the first category, inclusion of 200 kilograms of

2    controlled substances, here, defendant's Objections 3 and 7

3    relate to PSR paragraph 17 and 26, which attributes 200

4    kilograms of methamphetamine to the defendant as part of his

5    relevant conduct.  Based on the information contained in the

6    PSR, addendum and the Government's response, and in light of

7    relevant case law, this Court has tentatively determined it

8    should overrule defendant's Objections Number 3 and Number 7

9    for the following reasons.

10    As conceded by defendant, PSR paragraph 17 and 26

11    accurately report admissions by defendant of trafficking,

12    quote, "at least 300, probably 2- to 300 keys of

13    methamphetamine between September 2020 and December 16, 2022 as

14    part of his continuing role in the DTO."  This is reflected in

15    Document Number 162 and at page 2 where the statements are

16    attributable to Mr. Barrow.

17    Under Supreme Court and Fifth Circuit law, a

18    sentencing court may properly approximate drug quantities when

19    calculating relevant conduct when narcotics recovered in a drug

20    seizure do not reflect the skill of the actual offense conduct.

21    This is a straightforward application of Guideline Section

22    2D1.1, Comment Note 5.  A Court may do so by extrapolating,

23    quote, "from any information that has sufficient indicia of

24    reliability to support its probable accuracy."  This is a

25    direct quote from United States vs. Barfield, 941 F.3d 757, a

 1    Fifth Circuit case from 2019 quoting United States vs. Valdez,

 2    a Fifth Circuit case from 2006 available at 453 F.3d 252.

 3         Applied here, the Court expressly finds that the

 4    statements made by defendant do bear sufficient indicia of

 5    reliability to support their probable accuracy and therefore

 6    may be used by this sentencing court to determine relevant

 7    conduct.  The Court further finds that these drug quantities

 8    were trafficked as part of a series of drug trafficking

 9    offenses that were all part of a common scheme or course of

10    conduct sufficient to be encompassed as relevant conduct.

11         In applying these principles of course of conduct or

12    common scheme, the Court at all times was guided by United

13    States vs. Nava, 957 F.3d 581, a Fifth Circuit case from 2020;

14    United States vs. Rhine, a Fifth Circuit case from 2009, 583

15    F.3d 878; and United States vs. Alaniz, A-L-A-N-I-Z, a Fifth

16    Circuit 2013 case which may be found at 726 F.3d 586.

17         If anything, the Court finds that it is most likely

18    that the PSR significantly undercounts defendant's relevant

19    conduct because defendant originally told law enforcement he

20    trafficked over 300 kilograms of methamphetamine rather than

21    the more conservative estimate of 200 kilograms used by the

22    PSR.  Here, the Court is referencing Document Number 163 at

23    page 7.  When defendant revised his estimate to 200 to 300

24    kilograms, he emphasized twice that he was -- that he had

25    easily trafficked this amount, and in this case the PSR writer

 1    used the more conservative bookend.

 2          Here, defendant objects to reliance on these

 3    statements for two reasons.  First, he argues that he made

 4    these statements while under death threats from members of the

 5    DTO.  Second, he argues that the statements are not true since

 6    he exaggerated the quantity of drugs he actually trafficked in

 7    an effort to induce federal agents into incarcerating members

 8    of the DTO.  These arguments are set forth in Document Number

 9    162 at page 2.

10          The Court disagrees for the following reasons.

11          First, defendant produces no evidence to show that he

12    was under threat of death from the DTO.  As noted in the

13    Government response, defendant never mentioned threats against

14    his life during the interview where he admitted to drug

15    quantities.  The Government's response is found at Document

16    Number 163, page 7.

17          Defendant further made no argument during his trial

18    showing or proving that he trafficked drugs only because of

19    death threats.  And additionally, defendant decided not to rely

20    on a defense of duress.  To date, defendant has produced zero

21    evidence that anyone threatened him in an effort to induce him

22    to control -- I'm sorry, to traffic controlled substances.

23    Quite to the contrary, defendant stated multiple times in

24    multiple interviews with law enforcement that he owed the DTO

25    monetary debts incurred during his term of imprisonment but

1    made no indication that he needed to repay this amount under

2    threat of harm.

3           So here, the Court is relying on its own recollection

4    of the trial proceedings, testimony and evidence presented at

5    that trial and also Document Number 163-4 at page 8, which

6    states, quote, "So you owe him roughly about 60,000?"  "Yes,

7    somewhere around that," end quote.  That defendant felt an

8    obligation to repay debts to individuals in the DTO unconnected

9    from even allegations of threats of violence is insufficient to

10   show that defendant's admissions should be disregarded by the

11   sentencing court.  Second, defendant's argument that his

12   statements were exaggerated or that he inflated relevant drug

13   quantities likewise fails under binding Fifth Circuit

14   precedent.

15          Here, defendant argues he exaggerated or inflated

16   drug quantities to persuade law enforcement to arrest other DTO

17   conspirators as a basis for disregarding admitted drug

18   quantities, but the Fifth Circuit rejected a similar argument

19   in United States vs. Barfield, 941 F.3d 757, a Fifth Circuit

20   case from 2019.  Specifically, the Fifth Circuit explained

21   where a defendant does not introduce evidence to rebute -- to

22   rebut his post-arrest admission of relevant conduct, the

23   district court may consider it at sentencing.  Counsel may find

24   that direct quote at pinpoint 764.  Applied here, defendant has

25   not presented any evidence sufficient to rebut his admission of

```
 1    drug trafficking.
 2              For those reasons and the reasons set forth in the
 3    Government's response and the probation officer's addendum,
 4    this Court has tentatively determined that it should overrule
 5    defendant's Objections Number 3 and Number 7.
 6              I'll now invite --
 7              MR. ELZA:  Your Honor?
 8              THE COURT:  Yes.
 9              MR. ELZA:  I'm sorry.  I turned to talk to my client.
10    I missed the last part that you said, and I just want to make
11    sure I don't miss something important.
12              THE COURT:  If you could tell me what you last
13    recall, I can return to that point.  I was, in closing, citing
14    to United States vs. Barfield, and then I was making a final
15    statement of the tentative determination to overrule Objection
16    3 and 7.
17              MR. ELZA:  The final statement is what I missed.
18              THE COURT:  Okay.
19              MR. ELZA:  Okay.  I apologize.
20              THE COURT:  So do you have -- I can repeat that the
21    Court was relying on United States vs. Barfield.  There, the
22    Court states that a defendant does not -- where a defendant
23    does not introduce evidence to rebut his post-arrest admission
24    of relevant conduct, the district court may consider it at
25    sentencing.  Counsel can find that case at 941 F.3d 757,
```

1    pinpoint 764.

2              The Court stated and does continue to find that

3    defendant has not presented evidence to the contrary, certainly

4    not evidence sufficient to rebut the testimony and evidence

5    bearing sufficient indicia of reliability.  And for all those

6    reasons the Court has tentatively determined that it should

7    overrule Objections 3 and 7 to PSR paragraphs 17 and 26, and

8    this entire category addresses the controlled substances that

9    are properly attributable to defendant as calculated in those

10   paragraphs.

11             Ms. Bell, you may proceed with any information or

12   argument that is not cumulative of the written submissions to

13   the Court.

14             MS. BELL:  Nothing outside the written submissions,

15   Your Honor.

16             THE COURT:  Anything from defendant?

17             MR. ELZA:  And just confirming you're asking solely

18   related to Objections 3 and 7?

19             THE COURT:  Yes.

20             MR. ELZA:  Okay.  Again, not to be cumulative because

21   we will rely on our written objections, I would again harken

22   back to my argument a little bit ago, which is we can see and

23   respect the Court's view that these were admissions from him,

24   but in context they're not true and he maintains that they're

25   not true.

1          I'd also like to incorporate the written allocution

2    that we -- that I received today that we provided to the Court

3    right before we started.  I don't know if the Court's had time

4    to read that, but Mr. Barrow in his own words talks about what

5    was going on in that hearing and I would just incorporate his

6    words.

7          THE COURT:  Okay.  So here, the Court did receive and

8    did mark as defendant's Exhibit A a written allocution.  It is

9    in handwritten form.  It spans five pages and it bears

10   defendant's signature.  The Court did review Exhibit A prior to

11   the sentencing hearing.  It was my understanding that this

12   would be used as an allocution, but you've made reference now

13   to this Exhibit A twice.  But because this one -- this one

14   reference is more particular to exact sentences specific to

15   exaggerated or inflated drug quantities, I'll ask that you call

16   out the specific lines in Exhibit A that you're referencing.

17         MR. ELZA:  And first of all, I guess I apologize to

18   the Court for the lateness of it.  I got it -- we met last

19   night for a good bit of time.  He wanted to rewrite it, and so

20   when I got it today, I tried to get it to the Court as quickly

21   as possible and fair that it was --

22         THE COURT:  And again, yes, I understand -- I find

23   that defense counsel had good cause for the delay.  This Court

24   has photocopied defendant's Exhibit A.  It was denominated as

25   an allocution, but it can certainly be marshalled in support of

1    any argument you want to make.  The Court has also provided
2    copies to the Government and court staff, so you can make
3    reference to any section.  I just want to make certain I
4    understand your supplemental argument to Objections 3 and 7,
5    and if you'll call out by page number and section what
6    information in Exhibit A should be used to supplement your
7    Objection 3 and 7.
8                    MR. ELZA:  The -- Mr. Barrow would point the Court to
9    page 1 which gives the context about how that meeting came into
10   play.  Moving into page 3 --
11                    THE COURT:  Well, specific -- let's just go --
12                    MR. ELZA:  Yeah, I'm sorry.
13                    THE COURT:  -- page by page.  On page 1, I see a
14   reference to a proffer, proffer agreements, defendant's
15   insistence on absolute immunity and some of the negotiations
16   between defendant and investigators and prosecutors, but
17   what -- what particular sentence is relevant to Objection
18   Number 3 and 7?
19                    MR. ELZA:  Okay.  So I guess what I'd say is that's
20   the intro to the proffer I'm talking about.
21                    THE COURT:  Okay.  So you're just using page 1 to
22   sort of frame what you argue are exaggerated and inflated
23   statements later?
24                    MR. ELZA:  Yes.
25                    THE COURT:  Okay.  So let's move to the next relevant

1   page.

2          (Pause in proceedings.)

3          MR. ELZA:  Okay.  One second, Your Honor.

4   Mr. Barrow's pointing out to me and then I will relay to the

5   Court just as quickly as I get it.

6          (Pause in proceedings.)

7          MR. ELZA:  Okay.  Whenever the Court's ready.

8          THE COURT:  Please proceed.

9          MR. ELZA:  On page 1, starting probably about 80

10  percent down the page towards the right side, it's a sentence

11  that begins with "I requested."

12         THE COURT:  I'm at the same point.

13         MR. ELZA:  I requested -- and -- "I requested that I

14  have absolute immunity because I was not present for the

15  proffers of Victor or Vincent Chavez, and the information I was

16  told to relay was falsely made to implicate me so that it would

17  look like I was capable of being the missing link that could

18  secure the arrest of the individuals the government was

19  interested in."

20         THE COURT:  Okay.  Understood.  Next page, please.

21         MR. ELZA:  I've been directed to page 3, very close

22  to the same place on the page, probably not quite 80 percent

23  down, sentence begin with "I."  "I was told what to say in

24  hopes of securing cooperation agreement for them."  I believe

25  Mr. Barrow would say referring back to Vincent and Victor.

1    And -- and "It's for that reason I am here trying to protect

2    myself and my family has put me in this predicament because I

3    trusted the government would act in good faith towards me like

4    they suggested they would but didn't obviously."

5              Okay.  I think those would be the citations that the

6    Court was requesting.

7              THE COURT:  Okay.  So I will add those supplemental

8    arguments rooted in defendant's Exhibit A at the sentencing

9    hearing and just invite brief response from the Government.

10             MS. BELL:  Thank you, Your Honor.

11             Your Honor, based on the testimony at trial, Agent

12   Brown and Agent Koval testified that Mr. Barrow was read his

13   Miranda warnings before he made the December 2021 statement,

14   that he was not offered any promises.  He was not there for a

15   proffer nor granted immunity or promised immunity.  He now

16   makes self-serving statements, Your Honor, that put forth his

17   narrative, Your Honor, but I would point the Court to Document

18   163, page 9.  Again back to the Barfield case, the Court

19   stated, quote, that "It is proper for the district court to

20   rely on a presentence report's construction of evidence to

21   resolve a factual dispute rather than relying on the

22   defendant's version of the facts."  That can be found at

23   Barfield at pincite 766.

24             Your Honor, the defendant's statements that he makes

25   now contradict certainly what he told law enforcement in

1    December of 2021.  He never told the officers that he was

2    making these statements that were lies.  Your Honor, there was

3    evidence in his phone to back up his statements that he was

4    engaged in large-scale trafficking of narcotics, Your Honor.

5            And so based on all of that, we would ask the Court

6    to overrule the defendant's objection.

7            THE COURT:  The Court hereby adopts its tentative

8    determination as its final finding as supplemented by the

9    argument of the AUSA at the sentencing hearing, and the Court

10    incorporates those reasons alongside the Government's response

11    in the addendum, and for those reasons overrules defendant's

12    Objections Number 3 and Number 7 to PSR paragraphs 17 and 26.

13            Next, the Court will address the leadership role

14    adjustment.  This is defendant's Objection Number 5 to PSR

15    paragraphs 19 and 29 which apply the leadership role adjustment

16    specific to the drug trafficking organization.

17            The Court has tentatively determined as follows.

18            In accord with the factors listed at Application Note

19    2 of Section 3B1.1 of the guidelines and the following

20    fact-based determination, the Court has tentatively determined

21    it should overrule the objection in part and sustain in part.

22            First, Section 3B1.1(c) states, quote, "If the

23    defendant was an organizer, leader, manager or supervisor in

24    any criminal activity other than described in Part A or Part B,

25    increase by two levels."  Application Note 2 further explains

1    that, quote, "To qualify for an adjustment under this section,

2    the defendant must have been the organizer, leader, manager or

3    supervisor of one or more other participants."

4         Applied here, information bearing sufficient indicia

5    of reliability contained in the PSR, testimony presented at

6    trial and exhibits presented by the Government at sentencing

7    all support this Court's finding that the defendant's role in

8    the DTO rose to at least the level of manager or supervisor

9    sufficient to qualify for the two-level increase set forth at

10   Section 3B1.1(c).

11        Evidence shows that defendant used Vincent Chavez,

12   Jr.'s home as a, quote, "stash house" for his drug trafficking

13   organization and allowed Chavez, Jr. to sell drugs on his

14   behalf.  This is also reflected in Document Number 163 at page

15   11, Exhibit A.

16        Chavez was also required to obtain permission from

17   defendant before selling narcotics, demonstrating defendant had

18   at least a managerial role over him.  Text messages recovered

19   from defendant's phone likewise show that he recruited drivers

20   to traffic controlled substances from Mexico as part of the

21   DTO.  He instructed workers in the DTO on how to operate and

22   generally exercise a managerial role over individuals working

23   within the DTO.  This is also reflected in Document Number 163

24   at pages 11 through 16.

25        For these reasons, the Court has tentatively

1    determined it should overrule defendant's objections to the

2    application of the two-level increase pursuant to Section

3    3B1.1(c).  However, defendant also objects to PSR paragraph 19

4    which states that defendant exercised this leadership role for

5    no less than one year, that year being 2021.  As argued by

6    defendant, he could not have exercised a leadership role for

7    the entirety of 2021 because he spent a significant portion of

8    that year incarcerated.  This is argued in Document Number 169

9    at page 3.

10          Applied here, PSR paragraph 49 supports this

11   assertion by showing defendant was arrested for the instant

12   offense on February 18, 2021.  On balance, the Court finds that

13   the evidence of defendant's incarceration for the instant

14   offense constitutes sufficient permissible rebuttal evidence

15   necessary to overcome the PSR's overall indicia of reliability

16   in asserting that defendant maintained a leadership role in the

17   DTO for the entirety of the year 2021.

18          Without evidence defendant continued his criminal

19   enterprise while incarcerated, which is a possibility, this

20   Court finds that the PSR should be amended to remove this

21   reference and has tentatively decided to sustain defendant's

22   objection to this reference in the PSR.  However, this

23   clarification to the PSR does not affect the Court's tentative

24   ruling that defendant qualifies for a two-level increase in the

25   total offense level under Section 3B1.1(c).

```
 1              In summary, the Court overrules defendant's Objection
 2     Number 5 to PSR paragraphs 19 and 29 vis-a-vis the two-level
 3     increase pursuant to Section 3B1.1(c), but sustains defendant's
 4     objection to the PSR paragraph 19 reference to the duration of
 5     that leadership role during defendant's period of
 6     incarceration.
 7              And at this time, I'll invite any argument or
 8     additional information that is not cumulative of the written
 9     work product.
10              Ms. Bell, you may proceed.
11              MS. BELL:  Nothing outside the written documents,
12     Your Honor.
13              THE COURT:  And, Mr. Elza, you may proceed with any
14     argument that is not cumulative.
15              MR. ELZA:  And in an attempt to economy, we would
16     incorporate my recitation or my supplementation and argument to
17     Objection Number 4 to paragraph 18 that was taken up in the
18     last set since those tie in factually.
19              THE COURT:  And that prior objection now ruled on is
20     Objection Number 10 to PSR paragraph 41, the failure to report?
21              MR. ELZA:  I'm sorry, I may have misspoken.  I -- to
22     paragraph 4.
23              THE COURT:  Oh, you're not referencing a prior
24     objection already adjudicated but another document.
25              MR. ELZA:  Or no.  Okay.  I'm going to start over
```

```
 1    because I think I took us down the wrong path.
 2              THE COURT:  Okay.  Strike all of that.  When lawyers
 3    start talking numbers it can get confusing.  We all went to law
 4    school to avoid math.
 5              MR. ELZA:  So my understanding is that we are
 6    addressing Objection 5 to paragraphs 19 and 29.
 7              THE COURT:  Correct.
 8              MR. ELZA:  And in my written objection on behalf of
 9    Mr. Barrow, I incorporated the written arguments from Objection
10    4 to paragraph 18 above.
11              THE COURT:  Okay.
12              MR. ELZA:  And so what I was trying to do in a simple
13    manner that I've complicated is to also incorporate my argument
14    to the Court today on the previously-adjudicated Objection 4 to
15    paragraph 18 here, and probably would have been quicker if I
16    would have just rehashed it and I apologize.
17              THE COURT:  Understood.  And so this would be
18    specific to Objection 4 which pertained to the use of the
19    terminology "enlist" or counsel's understanding of that term as
20    used in PSR paragraph 18.  This Court has already overruled
21    Objection Number 4 and thereby intends to give full effect to
22    PSR paragraph 18.
23              What else would you squeeze from that argument into
24    this Objection Number 5?
25              MR. ELZA:  My focus from 4 would have been from my
```

```
 1   argument today, as well as the written objection to Number 4 on

 2   where Vincent is in the -- in the drug trafficking

 3   organization --

 4            THE COURT:  Okay.

 5            MR. ELZA:  -- which is again -- I mean, he was a

 6   bigwig long before Mr. Barrow was around, and, in fact, in

 7   discovery talks about Victor's the one that introduced Vincent

 8   to Barrow.  So again, just for added context and clarification,

 9   we would add that to our argument -- or to our objection.

10            THE COURT:  Understood.

11            And I'll invite a brief response from the Government.

12            MS. BELL:  Just for the record, there is no evidence

13   whatsoever that Vincent Chavez, Jr. was a bigwig or a higher-up

14   in the drug trafficking organization.  In fact, all the

15   evidence is to the contrary, Your Honor.  Thank you.

16            THE COURT:  Okay.  Thank you, counselor.

17            The Court does agree with the AUSA's response to

18   defense counsel's supplemental argument.

19            (Pause in proceedings.)

20            THE COURT:  And in direct response to defendant's

21   supplemental argument at the sentencing hearing which

22   incorporated by reference his Objection Number 4 now overruled,

23   I would add Guideline Section 3B1.1(c), Application Note 4

24   commentary that explains "In distinguishing a leadership and

25   organizational role from one of mere management or supervision,
```

1    titles such as 'kingpin' or 'boss' are not controlling.
2    Factors the Court should consider include the exercise of
3    decision-making authority, the nature and participation in the
4    commission of the offense, the recruitment of accomplices, the
5    claimed right to a larger share of the fruits of the crime,"
6    et cetera, et cetera.
7         This Court is not finding that defendant is an
8    organizer or leader under Section 3B1.1(a) and that defendant
9    can point to others within the DTO who might arguably qualify
10    for the 3B1.1(a) enhancement.  It is of no effect at this
11    sentencing when the Court is applying the 3B1.1(c) enhancement.
12         And for the reasons previously stated, the case law,
13    the analysis and also the Government's response and the
14    probation officer's addendum, this Court does overrule
15    defendant's Objection Number 5 and will apply PSR paragraph 19
16    and 29 as written.
17         Next, regarding the Saldana affidavit, here,
18    defendant's Objection Number 6 pertains to PSR paragraphs 20,
19    23 and 30, which describe and apply a sentencing enhancement
20    relevant to codefendant's affidavit.  The Court has tentatively
21    determined that it should sustain defendant's objection.  In
22    light of Guideline Section 3C1.1, applicable guidelines
23    commentary and relevant case law, the Court finds that
24    defendant has made his case, and this Court will sustain
25    defendant's objection.

1          Section 3C1.1 states that defendant's offense level

2    should be increased by two levels where defendant willfully

3    obstructed or impeded or attempted the same, the administration

4    of justice with respect to the investigation, prosecution or

5    sentencing of the instant offense of conviction; and, two, the

6    obstruction related to the defendant's offense of conviction

7    and any relevant conduct or a closely-related offense.

8          Here, the PSR states defendant qualifies for this

9    enhancement because he sent text messages to USPO Bailey,

10   B-A-I-L-E-Y, stating he did not possess the controlled

11   substances in the instant offense and because he unlawfully

12   influenced his codefendant in the instant offense to provide

13   materially-false information.  This is reflected in PSR

14   paragraphs 20 and 23.

15         First, the Court will address the text message to

16   USPO Bailey.  In those messages, defendant describes the Rhome

17   traffic stop seizure of controlled substances and asserts both

18   that he was unaware of the methamphetamine in the vehicle and

19   that his codefendant would be submitting an affidavit taking

20   responsibility for same.  That is reflected in PSR paragraph 11

21   and 12.

22         But Application Note 2 of Section 3C1.1 states that,

23   quote, "This provision is not intended to punish a defendant

24   for the exercise of a constitutional right, including a denial

25   of guilt other than a denial under oath that constitutes

1    perjury."  Instead, refusal to admit guilt to a probation

2    officer expressly does not constitute willful obstruction of

3    justice.  Defendant's assertion he was unaware of the presence

4    of methamphetamine in his car comports with his assertion of

5    innocence and insistence of holding the Government to its

6    burden of proof at trial.

7            Additionally, the Court finds that defendant's text

8    message to USPO Bailey did not rise to the level of seriousness

9    contemplated by the examples of covered conduct in Application

10    Note 4 to the same guideline.

11            Next, the PSR states that defendant qualifies for an

12    obstruction of justice enhancement for unlawfully influencing

13    his codefendant to provide materially-false information to the

14    probation officer.  The PSR seems to reach this conclusion

15    based on defendant's assertion to his PO that his codefendant

16    would submit such affidavit, his codefendant's assertion of

17    innocence during the Rhome traffic stop and the codefendant's

18    subsequent acquittal at trial.  The Government supports this

19    conclusion by identifying defendant's December 16, 2021

20    interview with DEA where he stated his codefendant was not

21    involved in the instant offense.  This is reflected in Document

22    Number 163 at pages 14 and 15.

23            From this, the Government contends that, quote, "The

24    only logical explanation for Saldana falsely confessing to the

25    methamphetamine is that someone induced her to do so, and the

1    only person who had a motive for Saldana to take the fall is

2    Barrow."  The Court is quoting from Document Number 163 at page

3    14.

4             On balance the Court disagrees.  Instead, there are

5    many reasons why defendant's codefendant, whom he was in a

6    romantic relationship with at the time, may have written the

7    affidavit at issue.  The Government and PSR's assertion that

8    defendant's influence over his codefendant caused her to write

9    the affidavit is one interpretation but not the only.  The

10   conclusion that defendant's influence was unlawful requires a

11   further inference that is unsupported by the evidence sub

12   judice.

13            Here, the Court does not find by a preponderance of

14   the evidence that the affidavit resulted from defendant's

15   unlawful influence over his codefendant, and the Court further

16   finds that the conclusions reached in the PSR as to unlawful

17   influence are not supported by an adequate evidentiary basis,

18   even if a logical inference in one theory of the case presented

19   by the Government.  Here, the Court is guided by United States

20   vs. Cabrera, 288 F.3d 163.

21            For all these reasons and reasons stated in

22   defendant's Objection Number 6, the Court has tentatively

23   determined that it should sustain defendant's objection to PSR

24   paragraphs 20, 23 and 30.

25            I'll now invite any argument that would not be

1    cumulative of the written submissions.

2            Ms. Bell, you may proceed.

3            MS. BELL:  Nothing outside the written submissions,

4    Your Honor.

5            THE COURT:  And anything further, Mr. Elza?

6            MR. ELZA:  Not on this objection, Your Honor.

7            THE COURT:  Okay.  So that your notes can be complete

8    here, the Court is sustaining defendant's Objection Number 6 to

9    PSR paragraphs 20, 23 and 30, and the Court will order the

10   probation officer to reflect same.

11           Next, regarding methamphetamine actual, defendant's

12   Objection Number 8 to PSR paragraph 26 objects to the use of

13   methamphetamine actual when calculating drug quantities

14   attributable to defendant.  In light of binding Fifth Circuit

15   case law, the Court has tentatively decided to overrule

16   defendant's objection.  As conceded by defendant, his argument

17   is foreclosed by Fifth Circuit precedent.  Defense counsel

18   admits this in Document Number 162 at 3.  The Court agrees with

19   defense counsel's assessment that the issue is foreclosed and

20   is guided by United States vs. Molina, 469 F.3d 408, a Fifth

21   Circuit case from 2006.

22           And because of this binding Fifth Circuit precedent,

23   the Court has tentatively determined it should overrule

24   defendant's Objection Number 8 to PSR paragraph 26, though the

25   Court finds that defense counsel capably and effectively

```
 1    preserved the issue for further appellate review should that
 2    precedent suffer reversal.
 3              I'll now invite any additional argument or
 4    information that would not be cumulative, beginning with
 5    Ms. Bell.
 6              MS. BELL:  Nothing further, Your Honor.
 7              THE COURT:  Anything further, Mr. Elza?
 8              MR. ELZA:  No, Your Honor.
 9              THE COURT:  Okay.
10              MR. ELZA:  Before we shift to the next one, can I
11    make sure I'm not off on our objections?
12              THE COURT:  You may.
13              MR. ELZA:  7 -- Objection 7 which was paragraph 26,
14    we've addressed it in other contexts I think, but did that need
15    to be addressed with this group?
16              THE COURT:  I paired Objection Number 7 with
17    Objection Number 3.  Both --
18              MR. ELZA:  Oh, I'm sorry.  I just saw my notes.
19              THE COURT:  Okay.
20              MR. ELZA:  I apologize.
21              THE COURT:  Again, lawyers with numbers.
22              MR. ELZA:  Yeah.
23              THE COURT:  This is why we hire forensic accountants
24    to do this stuff.  Unfortunately, this is a sentencing context
25    and we can't delegate this to a CPA.
```

1          So yes, Objections Number 3 and Number 7 were grouped

2    by the Court and adjudicated as a set, and they correspond to

3    paragraphs -- PSR paragraphs 17 and 26.

4          Is there any additional clarification that you

5    require?

6          MR. ELZA:  No.  No.  As soon as I started talking, I

7    looked down and saw my note.

8          THE COURT:  Okay.

9          MR. ELZA:  I've got two sets of notes going and

10   that's part of the problem.

11         THE COURT:  Okay.  Well, thank you for working with

12   the Court to make sure the record is clear, but yes, I think

13   that one has been asked and answered and the Court has ruled.

14         And I think we're to our final objection affecting

15   guideline -- or potentially affecting guidelines calculation,

16   defendant's Objection Number 9 to PSR paragraph 34 which

17   calculates defendant's base offense level.

18         In light of the Court's previous ruling -- rulings,

19   the Court has tentatively decided to sustain in part

20   defendant's Objection Number 9 to the PSR's calculation of his

21   base offense level.  This specifically relates to the Court

22   sustaining defendant's Objection Number 6.  That will result in

23   a different base offense level calculation.  Applying forward,

24   all of the Court's rulings overruling and sustaining

25   defendant's objection, the base offense level in the PSR should

1    be adjusted from 44 to 42.  And in that limited way, the Court

2    sustains in part defendant's Objection Number 9 to give effect

3    to this Court's aforementioned rulings on all of defendant's

4    objections.

5         Finding that defense counsel has capably and

6    effectively preserved for further appellate review all of the

7    objections that were timely submitted, written and argued to

8    the Court and that the net result is a change in the base

9    offense level from 44 to 42, do I hear any objection to this

10   ruling on defendant's Objection Number 9, Ms. Bell?

11        MS. BELL:  Your Honor, other than the Government's

12   position already stated with regard to Objection Number 6 and

13   9, Your Honor, no further comments, Your Honor.

14        THE COURT:  Okay.  Any further objection or argument

15   on this last Objection Number 9?

16        MR. ELZA:  At risk of overgeneralization and perhaps

17   duplication, I just would like to make clear that, you know,

18   that objection to me really incorporates all of our objections,

19   all the Government's responses and all of the Court's rulings

20   because all of that is what we used to head towards a

21   sentencing offense level.

22        So with that understanding --

23        THE COURT:  And that's why I said I find that you've

24   preserved for further appellate review any objections timely

25   submitted, written and argued.  I understand that point is made

1    here --
2              MR. ELZA:  Okay.
3              THE COURT:  -- a second time, but yes, I find that
4    those arguments are preserved for further appellate review.
5    That would arguably affect the final level, but the net effect
6    of all those rulings, some overrulings, some sustaining
7    objections, is that that final level should be adjusted from 44
8    to 42.
9              MR. ELZA:  Based on --
10             THE COURT:  Any objection to those calculations based
11   on the Court's rulings?
12             MR. ELZA:  No.  Based on the Court's rulings, that's
13   the proper calculation.
14             THE COURT:  Okay.  And just for clarification,
15   Ms. Bell, I understand that the Government may disagree with
16   some of those rulings, but now that those are in place, any
17   objection to the calculations that result?
18             MS. BELL:  No, Your Honor, just preserving the
19   Government's argument with regard to Objection Number 6.
20             THE COURT:  Understood.
21             I find that the Government has capably and
22   effectively preserved for further appellate review this Court's
23   ruling on defendant's Objection Number 6.
24             Now, dare I invite any untimely arguments, given the
25   extensive paperwork that we've put into this sentencing process

```
 1    thus far.  I'm loathe to do so, but I do want to provide

 2    counsel for the Government and counsel for the defendant one

 3    last opportunity to urge any untimely objections or requested

 4    clarifications to the PSR or addendum.

 5              Ms. Bell.

 6              MS. BELL:  Your Honor, based on the Court's ruling

 7    with regard to Objection Number 6, I think there needs to be an

 8    adjustment to PSR paragraph 32 under 4B1.1(a) and perhaps PSR

 9    paragraph 34, Your Honor, just based on the Court's ruling.  Is

10    that correct?

11              THE COURT:  Okay.  So PSR paragraph 32 --

12              MS. BELL:  The career offender enhancement, Your

13    Honor, and then the total offense level in paragraph 34 states

14    that when the total offense level is in excess of 43, the

15    offense level will be treated as level 43.  Would that change

16    Your Honor, or does 32 remain at 44?

17              (Pause in proceedings.)

18              MR. ELZA:  Can -- Your Honor?

19              THE COURT:  Any response from the defendant?

20              MR. ELZA:  Well, I was going to ask if you were

21    waiting on someone, if I could have some private time --

22              THE COURT:  Yes.  I'm conferring with the USPO to

23    make certain that there's no cascade effect to the Court's

24    ruling on levels.  While we do that, I'll order the microphones

25    disabled so you can have an attorney-client privileged
```

1    communication with the defendant.

2                (Off the record at 3:01 p.m.)

3                (On the record at 3:08 p.m.)

4                THE COURT:   Okay.   Regarding final argument of the

5    Government that the net result of the Court's sustaining

6    defendant's Objection Number 6, the Court sustains the

7    Government's objection and instructs the probation officer to

8    modify the PSR accordingly.

9                The adjusted offense level in PSR paragraph 31 should

10   now read 42, not 44.   The same adjustment should apply to PSR

11   paragraph 32, but the Court finds that it does not have any net

12   effect on the advisory guidelines range by operation of

13   Guidelines Section 4B1.1(a) and (b).   And defendant is --

14   because defendant is already in Criminal History Category VI.

15   So although PSR paragraph 32 is ordered adjusted from 44 to 42,

16   it has no net effect on the guidelines calculations because

17   defendant's criminal history is level VI and the charts that

18   would otherwise apply don't affect any sliding scale for this

19   defendant.

20               Finally, PSR paragraph 34 should be revised to

21   reflect a total offense level of 42, changing the current

22   number 43 to the revised number 42.

23               (Pause in proceedings.)

24               THE COURT:   So just to be pellucidly clear, when the

25   Court said it doesn't affect -- any of these adjustments affect

1    the advisory guidelines range, I misstated.  I'm referring to

2    the net effect of the career offender enhancement.  Because of

3    the operative criminal history in this case, there is no

4    sliding scale effect when the number -- when the offense level

5    moves from 44 to 42, but it will affect the final advisory

6    guidelines range when that offense level of 42 is combined with

7    the Criminal History Category VI.  And those adjustments will

8    be reflected in the Court's final calculation and pronouncement

9    of the advisory guidelines range.

10                Anything further, Ms. Bell?

11                MS. BELL:  Only that I think paragraph 34 would be

12   stricken, Your Honor, just because it's irrelevant.  If the

13   base offense level isn't over 43, then the paragraph is

14   unnecessary, Your Honor.  And so I would just suggest to the

15   Court that we would strike that paragraph.  It doesn't need to

16   be 42.  It's simply an unnecessary paragraph based on the

17   Court's prior rulings.

18                THE COURT:  Any objection, Mr. Elza?

19                MR. ELZA:  No, not as to the text that follows total

20   offense level, but I think at some point we have to have --

21                MS. BELL:  Oh, I'm sorry.

22                MR. ELZA:  -- a total offense level.  But I think the

23   text goes away.

24                THE COURT:  Yeah.

25                MS. BELL:  Right, the text goes away.

1          THE COURT:  That's right.

2          MS. BELL:  It's just the total offense level.  I

3    apologize.

4          THE COURT:  That's simply result of the sentencing

5    table that appears at the back of the manual.  The offense

6    level only goes to 43.  That's why there's a Chapter 5, Part A

7    comment.  The total offense level should still read 42, but

8    there should be no reference to the now unnecessary Chapter 5,

9    Part A, Comment Note 2 referencing what this Court should do

10   when calculations produce an offense level in excess of 43.

11         MS. BELL:  Thank you, Your Honor.  Nothing further.

12         THE COURT:  Okay.  So...

13         (Pause in proceedings.)

14         THE COURT:  All right.  So I know we've gone through

15   several objections, some overruled, some sustained, but now I

16   think the Government, defense counsel and this Court are on the

17   same page.  PSR paragraph 31 should be modified to reflect an

18   adjusted offense level of 42.  Similarly, PSR paragraph 32

19   should be adjusted to reflect the same number, 42.  And then

20   PSR paragraph 34 should be revised to include the same number,

21   42, minus the now unnecessary Chapter 5, Part A, Comment Note 2

22   commentary, which would only apply when the Court calculates a

23   total offense level in excess of 43, which is no longer the

24   case.

25         Ms. Bell, does the Government agree that the Court

1    has arrived at the right result revising PSR paragraphs 31, 32

2    and 34?

3              MS. BELL:  Those are the correct revisions, Your

4    Honor.  Thank you.

5              THE COURT:  And does defense counsel agree that now

6    that the Court has sustained certain defense objections, that

7    PSR paragraphs 31, 32 and 34 are properly revised?

8              MR. ELZA:  Yes, we agree.

9              THE COURT:  Okay.  As both defense counsel and the

10   Government understand, this Court must properly calculate an

11   advisory guidelines range as a starting point before we

12   proceed.  So I want to make certain that we all arrive at that.

13             Combined, the Court hereby adopts its tentative

14   determinations as its final finding with exception to -- as

15   explained for all of these objections affecting guidelines

16   calculations, and the Court thereby adopts the findings and

17   conclusions set forth in PSR paragraphs 17, 26 and 29 alongside

18   the relevant addendum paragraphs.  The Court's ordered

19   paragraphs 19, 20, 23, 30, 34, 31, 32 and 34 amended to reflect

20   this Court's rulings.  And to be clear, this Court will not

21   consider the two-level enhancement for obstruction of justice

22   when calculating the final advisory guidelines range.

23             The Court is now moving to those calculations.

24             The Court -- having ruled on defendant's objections,

25   the Court hereby adopts the remaining findings and conclusions

1  of the PSR and the addendum in their entirety except as

2  modified by the Court, specifically except as modified to

3  account for the Court sustaining defendant's Objection Number

4  6.

5          Here, the Court is applying applicable federal

6  statutes and the 2023 Guidelines Manual.  The Court has

7  independently compared the 2023 Guidelines Manual to the

8  guidelines that were in effect on the date of the instant

9  offense of conviction and thereby determined that application

10  of the 2023 Guidelines Manual will not violate the ex post

11  facto clause of the Constitution or any other right of

12  defendant.

13          Mr. Elza, does the defendant agree that this Court

14  may apply that new 2023 Guidelines Manual?

15          MR. ELZA:  The defendant so agrees.

16          THE COURT:  Does the Government agree?

17          MS. BELL:  Yes, Your Honor.

18          THE COURT:  Before calculating and announcing the

19  advisory guidelines range, the Court will note the impact of

20  statutory maximums as outlined in the PSR.  Here, the

21  statutorily-authorized maximum sentence is life imprisonment

22  and the statutory maximum fine is $10 million.

23          Having considered the probation officer's

24  calculations and conclusions and the PSR and addendum and

25  having ruled on objections thereto, specifically defendant's

1    objections thereto, the Court determines that the final correct

2    advisory calculations are as follows:  total offense level 42,

3    Criminal History Category VI, imprisonment range of 360 months

4    to life imprisonment, a supervised release range of five years

5    to each count, a fine range of 50,000 up to $10 million, and

6    restitution in the form of community restitution.

7            And does defense counsel have any objections to the

8    Court's calculation of the advisory guidelines range?

9            MR. ELZA:  No, that appears to be the proper

10   guideline range based on the rulings today.

11           THE COURT:  Okay.  Any objection to the calculations,

12   Ms. Bell?

13           MS. BELL:  No, Your Honor.

14           THE COURT:  The Court will apply that advisory

15   guidelines range.

16           As discussed at the outset of this hearing, the Court

17   has tentatively determined that nonguide -- a nonguidelines

18   downward variance is insufficient.  I'll now set forth factor

19   by factor this Court's reasons for denying or tentatively

20   determining it should deny defendant's motion for downward

21   variance.

22           Pursuant to Section 3553(a)(1), the history and

23   characteristics of this defendant includes a lengthy criminal

24   history of violent and drug-related offenses.  Defendant's

25   criminal history began as early as 18 years of age when he was

1    convicted of aggravated robbery.  This is reflected in PSR

2    paragraph 38.  There, defendant approached, assaulted and

3    robbed an individual alongside four accomplices.  Defendant

4    then instructed the victim to return to his home and retrieve

5    money that he possessed there.  Defendant then showed the

6    victim what he indicated to be a handgun and told defendant if

7    he alerted authorities to the commission of this crime

8    defendant would harm him and the victim's wife.  That is

9    reflected in PSR paragraph 38.

10           Defendant has another conviction for evading arrest

11   and disorderly conduct, neither of which received criminal

12   history points but were detailed in PSR paragraphs 39 and 40.

13   And defendant's conviction for disorderly conduct, a law

14   enforcement officer observed defendant participate in a mob

15   that pulled a man from his vehicle and began beating him.

16   While the victim was on the ground and unresponsive, the mob

17   continued assaulting the victim by kicking him.  Again, this

18   violent behavior received no criminal history points.

19           Defendant also has convictions for trafficking

20   controlled substances similar to the commission of the instant

21   federal offense of conviction.  In one of those cases,

22   defendant pleaded guilty to conspiracy to distribute and

23   possess with intent to distribute 50 grams or more of cocaine

24   base.  This is reflected in PSR paragraph 41.  In this case,

25   defendant established a network of individuals in Midland,

1  Texas whom he employed to distribute crack cocaine as part of

2  an organized DTO.  Defendant's criminal history also reflects

3  that he trafficked narcotics in a vehicle alongside $51,120 in

4  U.S. currency, a loaded nine-millimeter Taurus handgun and a

5  loaded .40 caliber Smith & Wesson handgun.  This is reflected

6  in PSR paragraph 42.

7          The Court notes that the Fifth Circuit has identified

8  this combination of drugs and firearms as tools of the trade.

9  The Court refers counsel to United States vs. Zapata-Lara,

10  615 F.3d 388, for that terminology.

11          Additionally, defendant fled from law enforcement

12  during the commission of that offense, as reflected in PSR

13  paragraph 42.  The length of defendant's criminal history

14  spanning the entirety of his adult life, the violent nature of

15  many of these offenses along with his repeated participation in

16  drug trafficking all constitute facts and factors that this

17  Court finds are aggravating in the extreme and weigh heavily

18  against granting defendant's motion for downward variance.

19          Next, pursuant to Section 3553(a)(2)(A) which

20  requires the Court to consider the nature and circumstances of

21  the offense, to reflect the seriousness of and to provide just

22  punishment for the offense, here, defendant trafficked 3,836

23  grams of methamphetamine actual, 853.4 grams of cocaine, 108.7

24  grams of fentanyl, 2,885 grams of methamphetamine actual and at

25  least 200 kilograms of methamphetamine mixture.  This is all

1    reflected in PSR paragraph 17.

2            Because defendant possessed fentanyl during the

3    instant offense, the Court will note that the potency of

4    fentanyl presents an enormous danger.  A January 2021 report

5    released by the United States Sentencing Commission on fentanyl

6    and fentanyl analog states, quote, "Fentanyl is approximately

7    30 times more potent than heroin and approximately 60 times

8    more potent than morphine, which results in an increased

9    potential for fatality, particularly when the user is unaware

10   they are using fentanyl."

11           Additionally, during defendant's arrest during the

12   Rhome traffic stop, defendant possessed $17,007 in U.S.

13   currency alongside 3,836 grams of methamphetamine actual.

14   Defendant described in detail his role in the DTO with

15   knowledge as to how that DTO charged for drugs, how they

16   delivered drugs and how much they paid drivers.  That's

17   reflected in PSR paragraph 14.  This DTO was connected to the

18   Sinaloa Cartel, and defendant played a managerial role in

19   trafficking controlled substances on behalf of that cartel.

20   This is reflected in PSR paragraphs 15, 18 and 19.

21           The Court finds the 3553(a)(2)(A) factors and facts

22   aggravating in the extreme and weighing heavily against

23   defendant's motion for downward variance.

24           Next, pursuant to Section 3553(a)(2)(C) which

25   requires the Court to promote respect for the law, to afford

1    adequate deterrence to criminal conduct and to protect the
2    public from further crimes of the defendant, here, defendant
3    has a history of criminality spanning the entirety of his adult
4    life involving violent offenses and drug-trafficking offenses
5    similar to the commission of this offense.
6          Despite many terms of incarceration, defendant has
7    refused to refrain from illegal conduct.  This is reflected in
8    PSR paragraphs 38 through 42.  Furthermore, defendant's
9    criminal conduct shows a blatant disregard for law enforcement
10   and the rule of law, as evidenced by his repeated criminality
11   and offenses involving flight from arrest.  Again, this is
12   detailed in PSR paragraphs 38 through 42.
13         The Court finds the 3553(a)(2)(C) factor and related
14   facts aggravating in the extreme, weighing heavily against
15   defendant's motion for downward variance.
16         For these reasons, the Court has tentatively
17   determined that it should deny defendant's motion for downward
18   variance.
19         I'll invite responsive argument from the Government
20   as long as it is not cumulative of the written work product.
21         MS. BELL:  Nothing at this time, Your Honor.
22         THE COURT:  And, Mr. Elza, you may respond.  You are
23   the movant.  You may respond with any argument you deem
24   necessary.
25         MR. ELZA:  We would rely on the filings.  Nothing

 1    that we have at this point would be noncumulative.

 2            THE COURT:  Okay.  Thank you.

 3            And, Mr. Elza, that the Court may have overruled

 4    various written objections or arguments made in sentencing

 5    memorandum does not mean the issues were not well briefed.

 6    This case garnered extensive legal research, analysis and

 7    briefing from both parties, and the Court thanks both defense

 8    counsel and the AUSA for excellent briefing.  I know it is a

 9    lengthy and complicated case, and the Court benefitted directly

10    from the capable and effective assistance of defense counsel.

11            For all those reasons and reasons stated in the

12    Government's response, the Court overrules any objection --

13    well, I'm sorry, this is the motion for downward variance --

14    the Court denies defendant's motion for nonguidelines downward

15    variance based on the aforementioned weighting of the 3553(a)

16    factors and facts.

17            Now let's turn to statements, final arguments and

18    allocutions.

19            Ms. Bell, did the Government comply with any and all

20    statutory obligations to identify and consult victims in this

21    case?

22            MS. BELL:  Yes, Your Honor.

23            THE COURT:  And do you intend to present victim

24    impact statements at sentencing?

25            MS. BELL:  No, Your Honor.

1           THE COURT:  And, Mr. Elza, the Court did receive and

2    does -- and has waived all deadlines to defendant's various

3    certificates of achievement and accomplishment reflecting

4    coursework that he has completed during his term of detention.

5           Does defense counsel intend to present any character

6    statements through live testimony?

7           MR. ELZA:  One moment, Your Honor.

8           (Counsel and defendant conferred off the record.)

9           THE COURT:  Okay.  With that, let's turn to final

10    arguments.  And just so counsel have at their disposal any

11    documents timely before the Court or untimely before the Court,

12    the Court has admitted as character statements the certificates

13    of accomplishment.  Those are marked as Exhibit B to the

14    sentencing hearing and those may be referenced as such, and the

15    Court has admitted Defendant's Exhibit A, which is a written

16    allocution spanning five pages signed by defendant.  I'll just

17    ask that counsel be consistent in referencing those as

18    Defendant's Exhibit A and Exhibit B.

19           So I'm going to begin with -- I know you're standing,

20    Mr. Elza, but I'm going to begin with the Government, inviting

21    final argument from the AUSA, and then I'll allow defense

22    counsel to respond.  Do you have a preference on allocution and

23    what order?

24           (Counsel and defendant conferred off the record.)

25           MR. ELZA:  Okay.  Mr. Barrow has told me that he does

1    have something he wants to address in allocution outside of the

2    letter.

3                THE COURT:  Okay.  Do you want that to follow your

4    argument or precede your argument?

5                (Counsel and defendant conferred off the record.)

6                MR. ELZA:  He's stated his preference is to go after

7    me.

8                THE COURT:  Okay.  So we'll follow that order of

9    operation, final argument from the AUSA, final argument from

10   defense counsel, followed by defendant's allocution if he

11   exercises his right.

12               MR. ELZA:  Your Honor, I think I owe you an answer

13   from the other -- we do not intend to have live witnesses.

14               THE COURT:  Oh --

15               MR. ELZA:  I'd asked for a moment, but it was

16   unrelated.  I should have just answered you before I asked for

17   the moment.

18               THE COURT:  Okay.  I know there were a packet of

19   certificates that are marked as Exhibit B.  I didn't know if

20   any of the persons referenced in those certificates intended to

21   submit character statements.  You have responded in the

22   negative, correct?

23               MR. ELZA:  Correct, Your Honor.

24               THE COURT:  Okay.  So we've moved on from character

25   statements.  Now to arguments and we'll follow the

1    aforementioned order.

2                Ms. Bell, you may proceed.

3                MS. BELL:  Your Honor, I would point the Court first

4    to the history and characteristics of the defendant.  First to

5    PSR paragraph 38, Your Honor, the defendant was released on

6    parole from that offense in November of 2008.  Your Honor

7    correctly states that this was a violent offense where the

8    defendant was convicted of aggravated robbery where he forcibly

9    took money from a victim and made threats to the victim.

10                Your Honor, while he was out on parole for that

11    offense -- and I'm basing this on paragraph -- PSR paragraph

12    41 -- the defendant in 2009 became a target of an investigation

13    in distributing crack cocaine in Midland, Texas, Your Honor.

14    So it is very close to the time that he was released on parole

15    that he becomes a suspect.  Your Honor, the Government submits

16    that he, when released, almost immediately engages in drug

17    trafficking activity again and again, Your Honor, and this is

18    evidence of that.

19                Your Honor, in that case he was in a role as the

20    leader/organizer.  He was organizing with Paul Gary Allen.

21    People do travel from Amarillo to Midland to recruit

22    individuals to distribute crack cocaine as they felt the

23    Midland market was more profitable and that money was coming

24    back to Mr. Barrow in Amarillo.  He was convicted of that

25    offense and he was placed in a residential reentry center in

1    Fort Worth.  He escaped from that facility.

2              So he's technically in the custody of the Bureau of

3    Prison at the time that he committed the new state offense,

4    which was November 22nd, 2017, reflected in PSR paragraph 42,

5    Your Honor, where he had over 5 kilograms of cocaine and over

6    $51,000 when he ran from police and he was convicted of that

7    offense.  He's released from that offense, Your Honor, in

8    September of 2020 and immediately engages in what leads up to

9    the instant offense, the traffic stop in February of 2021, Your

10   Honor.

11             And so again and again we can see that he engages in

12   criminal activity almost immediately upon release, and then he

13   engages in very significant criminal activity where he is the

14   leader/organizer of drug activity, Your Honor, and significant

15   drug activity, as the Court has discussed, over 200 kilograms

16   at least.  And again, in his statement he said 2- to 300

17   kilograms at least, Your Honor.  So that was a very

18   conservative estimate.

19             Your Honor, given the nature and circumstances of the

20   offense, the drug amounts and the dangerousness of all the

21   drugs involved in this offense, we believe that it is

22   aggravating and the Court should consider that.  And again, to

23   protect the public from future crimes of the defendant who has

24   shown over and over again, even when on supervision and

25   immediately upon his release and throughout his whole adult

1    life, Your Honor, he's continued these significant criminal

2    offenses and to protect the public from future crimes of this

3    defendant, this sentence must be significant.  The Government

4    believes that the appropriate sentence is life imprisonment,

5    Your Honor.  We'd ask the Court to impose the same.

6              THE COURT:  Thank you, counselor.

7              The Court will give appropriate weight to the

8    argument of the AUSA.

9              Mr. Elza, you may proceed with any argument you deem

10   necessary.

11             MR. ELZA:  May I approach the podium?

12             THE COURT:  You may approach.

13             MR. ELZA:  Thank you, Your Honor, for affording us

14   the opportunity to address the Court today, both up until this

15   closing argument as well as this closing argument.

16             I'll start in probably an unusual way, and that is to

17   thank this Court for the opportunity to represent Mr. Barrow.

18   I have done it proudly and I'm proud of him, and, you know, as

19   I stand here in front of this Court on repeated occasions, you

20   know, I always tell this Court -- you know, my job is to tell

21   the rest of the story, and there is so much more to this story.

22             You know, you can paint him with a consistent history

23   of criminal conduct, but if you look behind that, you can paint

24   him with a consistent history of being in debt to Victor

25   Chavez, Jr. and his affiliates, including Vincent Chavez, Jr.

1    It's not to excuse, but it is to explain.  He cannot get out

2    from the debt -- we heard that talk a lot today.  He cannot get

3    out from that debt that goes back a long ways and deals not

4    with a drug debt but with the debt of the reduced sentence that

5    he got for cooperation many times before.

6          And there are roomful of agents behind me that I've

7    worked with in many capacities throughout my career.  There's

8    the U.S. Attorney's Office and their delegation that I've

9    worked with throughout the years and they may have a different

10   spin on why or motive, but when you go through this file, from

11   the time of those reductions on the prior federal sentence,

12   this is a person who has worked with law enforcement and who

13   has given law enforcement many leads that led to successful

14   prosecutions.

15         I did not intend to go there, but that's kind of

16   where I feel this -- the hearing today led me to address that.

17         But why I'm here is to talk to you about Mandis.  I

18   can't tell you, I guess I will at some point, how many hours

19   I've spent with this man, but I mean, it's in the hundreds of

20   hours, more than any probably civil client or criminal client

21   I've had in 27 or 28 years, over and over up to last night.

22   And -- and I'll tell you I'll vouch for him, I like him, and he

23   is a likable person.  He is positive.  There are times he gets

24   frustrated, but he never gets negative.

25         And those certificates that are Exhibit --

```
 1          THE COURT:  B.
 2          MR. ELZA:  -- B only tell part of the story.  I hit
 3    it in our sentencing memorandum.  Almost since day one here he
 4    has led a Bible study at that jail daily.  At times, that Bible
 5    study is big enough that they afford him a larger room than
 6    just the corner of the dayroom where it might otherwise take
 7    place.  It is not a fraud.  We talk about religion.  We talk
 8    about the Bible.  He reminds me a lot about the Holy Spirit in
 9    our conversations.  And it is genuine.  I mean, he gets nothing
10    by fooling me, right?  I mean, these are part of the
11    relationship we have -- we have developed.
12          I will tell you this.  This Court, through voir dire,
13    knows this.  I have many ties to Tulia, Texas.  It's the first
14    place I remember living.  The first big case I ever worked on
15    was the civil case from the Tulia drug bust.  I've represented
16    the school district in federal litigation.  I represent the
17    City now.  I've represented the hospital district.  I've
18    represented the co-ops there.  I know that town and that
19    community.  I'm there a lot.
20          And during that time, I have talked to a lot of
21    people about Mandis and his old teachers, his old friends, one
22    of the lawyers down there.  They tell you the things that I'm
23    telling you, that he is likable and personable and smart and
24    nice.  Everybody has a story about where he is.
25          I -- I recognize the trial, the suppression hearing,
```

1    the arguments of counsel, of opposing counsel, and those

2    narratives go through and have a foundation.  They do, but they

3    don't tell the full story.  They don't tell who he is and they

4    don't define who he is.  He is a person.  He doesn't cuss.  He

5    doesn't gossip.  And as you look through this sentencing

6    memorandum, and I would like to hit just a little bit of it, I

7    mentioned his religion.  It is real.  It is not to be -- to be

8    mocked or discounted because of the circumstances he finds

9    himself in.

10            There are people out there that work at the jail who

11   call him the pastor of the dorm.  He takes it seriously, and

12   one thing that was hard to communicate in paper is it is so

13   important to him to help these men out there, young and old,

14   but especially the young men out there on how to reestablish

15   with their families.  Because that's the key.  If you're out

16   there there's a good chance you have burned those bridges, but

17   to him, he wants them to come out, to be able to know how to

18   interact with a spouse or a fellow parent or their own parents

19   because without that support they're likely to end up back

20   there.

21            He's a student.  You know, it's hard out there to get

22   access to the law library and it's restricted for the federal

23   inmates quite a bit, but every chance he gets he goes there.

24   Not just for himself and for the others.  I think your first

25   thought, everybody's first thought is oh, no, not one of those

1    jailhouse lawyers.  Because, you know, we went -- I think

2    anybody in this room can tell you about a year ago we had

3    somebody out there who was getting everybody to go to trial.

4    You probably saw that.  That's not what this man does.  He is

5    out there trying to help people make the best decisions for

6    themself.

7            And I -- I talk about those, and several of these I

8    learned anecdotally.  A gentleman I stood here representing

9    with severe mental illness, not talking about competency

10   issues, I'm talking about mental illness, paranoia, absolutely

11   making bad decisions, without knowing that I was his lawyer, I

12   could not figure out what the change was.  The change was this

13   man right here looking out for his fellow human being.  He got

14   nothing out of it, got nothing out of helping that man.

15           THE COURT:  Changing of the guard.

16           MR. ELZA:  Okay, scared me.

17           The -- I had another client that I stood before this

18   Court on -- who after his plea just became defiant and against

19   everything, and again I couldn't figure out quite what happened

20   but everything got good and it turned out it was Mr. Barrow

21   sitting down and working through issues with him to help him

22   understand and to trust.  Both of those cases worked out very

23   favorably for young men that would not have without his

24   mentorship and leadership.

25           He is a peacekeeper out there at that jail.  He has

1    mentored through the Bible study.  He has mentored through a

2    young man who's fighting demons of self-harm and suicide that

3    he still stays in touch with.  And I paint this because they're

4    real and they're not stories he told me.  They're not stories a

5    family member came and told me.  They -- in two years, with as

6    many clients as I represent out there, these are stories that I

7    have learned.

8            The other thing that I learned of kind of after I

9    wrote this sentencing memorandum through a third party, a

10   client that's out there, is, you know, a lot of these guys when

11   they get out there, not to be crass, they kind of -- they find

12   Jesus, they want to do better.  I mean, it's a shock to them,

13   and education's part of that.  And not everybody just gets to

14   go into a GED program.  You have to wait.  You have to be

15   accepted.  There are a group of these young men that have

16   reached out, and Mr. Barrow goes through with them to help them

17   so that when they get into that class they can hit the ground

18   running and get that GED.  Again, there's nothing in it for

19   him.

20           THE COURT:  Yes, the defendant talks about that at

21   page 4 of his written allocution --

22           MR. ELZA:  Okay.

23           THE COURT:  -- about helping inmates just launch and

24   pursue their GEDs and all the coursework and classwork that he

25   does.

1          MR. ELZA:  And it's important to him.

2          And so -- so why do all these things matter?  Because

3    there is so much good in a person.  He has found himself in an

4    incredible mess that has lasted years and years.  You know, our

5    goal, and I think the Court saw this at trial, we -- I hope the

6    Court saw this at trial.  We tried our best to do this

7    honorably.  It's hard to be on this side of the bar, but I hope

8    that the way that we have presented this case have been in line

9    with the person that I represent and his morals and how he sees

10   the life.  We ask the Court for any -- any mercy, any

11   consideration, but most importantly we ask the Court to

12   understand who the rest of Mandis Barrow is.

13          Thank you.

14          THE COURT:  Thank you, counselor.

15          And the Court will note for any record on appeal that

16   at all times defendant received capable and effective

17   assistance of counsel.  I would characterize Mr. Elza's

18   representation as impeccable in many ways, and I want to thank

19   Mr. Elza for taking this opportunity to represent this

20   defendant and to do so with the highest standards of

21   professionalism.

22          So with that, I'll invite Mr. Barrow -- let me first

23   explain to Mr. Barrow his right of allocution and then I'll

24   give him a full and complete opportunity to allocute if he

25   exercises that right.

1          Mr. Barrow, you have an absolute right to allocute at

2     federal sentencing.  Allocution simply means that you may tell

3     the Court any information you think is important to the

4     sentencing decision.  You may read aloud or rely upon this

5     written allocution marked as Defendant's Exhibit A.  You may

6     make arguments to the Court.  You may present facts for the

7     Court to consider.  You have an absolute right to allocute at

8     federal sentencing, but you can never be forced, compelled or

9     coerced into allocution.

10         Having consulted with your attorney about the concept

11    of allocution and your rights, do you choose to exercise your

12    right of allocution?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  You may proceed.

15         (Counsel and defendant conferred off the record.)

16         THE DEFENDANT:  Your Honor, the affidavit that I

17    actually wrote, I'm going to take my attorney's advice as far

18    as that.  He already advised me that you have it, that you've

19    read over it.  So I won't take up much more of the Court's time

20    rereading it, but there is some things that I would like to

21    address to the Court.

22         THE COURT:  Feel free to highlight anything in that

23    Exhibit A that you want to draw attention to and to use this

24    time for any other allocution you choose to enter.

25         THE DEFENDANT:  Yes, sir.

1          Your Honor, I want the Court to understand who I am.

2     You know, my attorney, he laid some things out to the Court

3     that was all factual, but no one has known the fear that I've

4     been in since 2017.  You know, the prosecution paints me out to

5     be an individual that had been receiving large amounts of

6     drugs, receiving these proceeds, enlisting individuals, and

7     that just is -- that's not me.

8          And so I want the Court to understand that this all

9     began with Victor Chavez and that I was doing my time in

10    federal prison and an opportunity was presented to me to get

11    out early.  And I knew the legal system, so I advised him of

12    the legal system, and because of that I was rewarded.  And I

13    thought that that's as far as it would go.  And so he actually

14    was released before I was, him and another individual that was

15    a part of that cooperation agreement.

16         And so once I had been released, little did I know

17    that Victor was going to come back into my life that quickly.

18    So as the -- Mrs. Bell noted, that true enough there was a

19    delivery or an arrest made in Houston in 2017 while I was still

20    technically on what she said was community supervision.  I was

21    not at the halfway house.  I was on home confinement.

22         And so while I was on home confinement, Victor and

23    some of his people came to my house, and at that particular

24    moment I had no choice on what to do.  I was not on a leg

25    monitor, but I was reporting to the actual halfway house on my

1  phone.  So when I went to work, I reported.  When I came back

2  in from work, I reported.  And I was always at my home.

3       But that night when I had to leave the day before

4  Thanksgiving, instead of me being able to spend time with my

5  family, the entire -- all those years I had been away from,

6  Victor and his people made me go to Houston.  It was not a

7  choice that I had, nothing that I could do about it.

8       Once I got to Houston with individuals that he had

9  actually provided to ride with me -- I was basically like a

10 mule in the situation, but I had no say-so on who I was

11 meeting, anything like that.  And so I didn't know that he was

12 the target of the investigation.  All I knew was he told me and

13 he made it very, very specific, very, very clear that this was

14 the only way that I was going to be able to work off that debt

15 for my incarceration, for me actually being released.  I didn't

16 know it was going to be a debt for me.  I thought because I

17 helped him be released, that I was going to be in the clear

18 from that.

19      So that entire night I stayed there in Houston,

20 calling home, trying to tell everyone like look, man,

21 everything's okay, I'm -- right now I'm safe, but in reality it

22 was far from it.  I was there with the Sicario that had two

23 firearms.  She -- Mrs. Bell alluded to that.  I was there with

24 these Sicarios that had two firearms, and when the police did

25 try to apprehend me that day and I saw it, I took that as my

 1    way out and I went on a high speed chase because at the moment

 2    I was afraid that this Sicario was going to shoot.

 3         And so I didn't give him an opportunity to know that

 4    the police were behind us with the lights.  So I took off as

 5    fast as I could in the car and I ran it into a pole and jumped

 6    out running.  And little did I know that this individual was

 7    going to try to turn State's evidence on me and make it like it

 8    was my product, but the prosecutor at that particular moment

 9    knew exactly what the scenario was and what position I was in

10    because she knew that Victor was already under investigation.

11         I had no opportunity to go back home to even be able

12    to check in and report that next morning.  The entire time they

13    could care less about my well-being.  The only thing that they

14    cared about was me delivering that substance.  It's like I've

15    been a mule for this organization in their regards on that

16    particular case, and they -- from that day forth, my entire

17    hands have been tied.  It's always threats after threats after

18    threats after threats after threats.

19         (Counsel and defendant conferred off the record.)

20         THE DEFENDANT:  I'm not -- yeah, I'm not -- what I'm

21    saying is nothing with this charge.  I'm talking about Houston,

22    the Houston charge from 2017.

23         So from that day forth, the prosecutor, Mrs. Anna

24    Bell, knows that these threats have been on my life since that

25    day for that same day.  I showed the agents everything in my

1   phone.  I gave them all the authorization to get into my phone
2   during that interview.  Even the agents themselves told me in
3   the interview -- and you can actually have -- we actually have
4   even at trial that there were hits on my life.  That was
5   presented to them and that everyone seems as if they're
6   ignoring it.
7            And that's the part that's a shame because when I
8   went to the Government to try to deal with this situation, I
9   felt like in the end that this was going to be my way finally
10  of being free from these individuals, and I sought their help
11  because they told me to give them the information in good
12  faith.  And that's what I did.
13           She wasn't -- Mrs. Anna Bell, the ASU -- AUSA, was
14  not present at that particular meeting.  They told me that she
15  was busy, that there was no way that she was going to be able
16  to go there.  I wanted absolute immunity.  I was instructed to
17  hire the attorneys that was supposed to do the proffer for
18  Victor Chavez, and that day that I hired the attorneys to do
19  this for Victor Chavez, that was on December 15th, 2021.  She
20  was present.  The agents were present.  And so I didn't
21  understand exactly what was going to go on in that proffer, so
22  I wanted absolute immunity just so that I could cooperate with
23  them.
24           So little did they know -- and now it was brought out
25  at trial, Your Honor, it was brought out at trial that Vincent

1  Chavez, that he had made up some of these -- these stories
2  because he also had been told what to say.  When Victor Chavez
3  was inside the county -- Randall County Jail when I was out
4  before I came here -- before I got incarcerated, he sent
5  someone out there from the Randall County Jail.  Phone records
6  will prove this, that he bonded an individual out.  And when
7  this individual was bonded out, he came to me with this
8  information of what it was that I was supposed to say.  His
9  girlfriend that is now charged with a particular crime had
10 Victor's phone, and the phone that he actually had, that
11 information was relayed to me to give to the prosecutor and the
12 agents.
13         Everything from my hearing, from that interview was
14 information that was given to me solely from Victor Chavez and
15 Vincent Chavez.  And while I was out there, Vincent Chavez's
16 family, his mothers, his sisters, the uncles, they all
17 threatened me by phone and actually came to the house and even
18 threatened my stepdaughters and Stephanie herself.  And I
19 alluded that to the agents.  They have this on the record from
20 my cell phone, violent text messages, not only from them but
21 also from Victor Chavez's brothers.
22         There's been no way around this.  When I was out
23 there I made a 9-1-1 call frantically one night from being
24 chased on my way home.  And I called and called and called and
25 no one -- no officers would pull over and I'm driving over

1    the -- excess over 100 miles an hour until I saw some lights of
2    two squad cars pulled over, and then just frantic, just
3    terrified, I went in there where they had the car pulled over
4    just to get away from the individuals that was chasing me.
5    I've been going through this this entire time since 2017,
6    trying to free myself from one individual and one individual
7    only, and that was Victor Chavez.  Vincent Chavez was just his
8    right-hand man that was actually there far before I ever came
9    out here, before I was ever released.
10          And so here it is I'm being told what to say at this
11   interview, that now the Government is making a position that
12   Vincent Chavez was a smallwig, but I have the affidavit here in
13   front of me that they actually presented to get the search
14   warrant to raid Vincent Chavez's house that says that he was a
15   multi-pound distributor right in front of me.  But yet, they're
16   making a stance that this is not accurate, that I recruited
17   him.  I didn't even know this guy.
18          And then this Court has probably had at least a
19   thousand federal cases.  My name has never been mentioned in
20   anyone's proffers and anyone's debriefings at all because I was
21   never around here selling anything.  I was never purchasing any
22   drugs, never moving any drugs, and that's not ironic.  You have
23   to think about this, Your Honor.  In a town this small, in a
24   city this small, with someone moving drugs of that substantial
25   amount, why is it that my name has never been brought up, Your

1    Honor, that now these two individuals come up with a story that

2    has been out here at Randall County, has been on the phones

3    actually coming up with these stories of what to say and what

4    to do, even from my December 16th, 2021 interview.

5           And so now I stand in front of you right now facing a

6    substantial amount of time, possibly take the rest of my life

7    away for something that was never even factual, that I was only

8    told what to say because Vincent Chavez and Victor Chavez only

9    cared about one thing and it was themselves.  And so I stand at

10   trial -- so I stood at trial, and that was not something that I

11   wanted to do.  I didn't want to have to go to trial on this.

12   The Government has been in positions where people have

13   cooperated with them and they stayed out there on the streets.

14   That was not offered to me.  That opportunity was not given to

15   me.

16          But everything is always made to make me look bad.

17   But the agents themselves testified at my trial, Your Honor,

18   and not just testified but testified to information that was

19   inaccurate and that the prosecution actually held.  And the

20   inaccuracies was, Your Honor, that on the December 16th

21   interview, those agents that were involved with Koval,

22   Blackerby and Special Agent Brown, those three agents came into

23   a discussion with me to see how I could get these drugs from

24   this DTO.

25          Once this information was made, they presented an

1    opportunity to where they said so much money could be presented

2    and could I actually secure the deal, and I had to tell them

3    that it was going to take much more money than that.  There

4    could not be something that small.  And so ten days later, nine

5    days later, I'm going to visit my family in Fort Worth, and on

6    my way to visit my family I get a phone call from the DTO.  I

7    get the phone call from the DTO.

8         And so the agent himself already knew that this was a

9    cooperation agreement.  In my mind, I thought that this is what

10   was going on.  Because for so many times with the Amarillo

11   Division, the Midland/Odessa Division and the Lubbock Division,

12   these agents had already made their approvals through the

13   government, through the AUSAs and the prosecutors there.  And

14   so I immediately thought it was the same thing.

15        So he testified at the trial, Special Agent Brown,

16   that a phone call did not take place, and this was factual,

17   that he had text messages that he instructed me to make, a

18   phone call that he instructed me to actually make that we

19   actually discussed back and forth.  I actually had to pull over

20   on the highway while I was driving.  But he testified that that

21   was not the case, that it never happened.

22        And so I'm not privileged to be able to go and grab

23   my phone and look up all of the threats.  I'm not privileged to

24   be able to go back and tell the Court hey, look, look at this

25   phone call that was made with Special Agent Brown.  Look at

1    these text messages that was made with Special Agent Brown.

2    Look at this situation where I told Special Agent Brown and the

3    other two agents, Koval and Blackerby, look, this is the

4    cooperation that was done with El Paso before this was ever

5    even a federal case.

6              And yet we're standing here today and there's not

7    even been one attempt at a motion presented by the Government

8    in my behalf, and it just shows an act of bad faith and bad

9    precedence with this Court, with the prosecution, because who

10   in the world would be in a situation to where they're

11   cooperating to this extent and never receiving anything for it?

12   And that the agents knew about it and then they made it very,

13   very clear, We don't want you working with anyone else.  We

14   only want you working with us.  But then they deny that it was

15   ever an opportunity for me to ever be presented with this and

16   they made it a statement saying that it was very, very clearly

17   made to me.  And it was never made to me.  The first time I

18   heard it was at trial.

19             And there's something that I wanted to address, Your

20   Honor, and I need your help because I don't know this, I'm

21   unfamiliar with this.  And so I've talked to my attorney about

22   it briefly, and we haven't just really had a lot of time to

23   really discuss the matter.

24             So at trial, when we were having the venire panel, we

25   were -- my codefendant was on the same table that Mrs. Bell is

1    on right now, but she was on the far end of the table, to your

2    far left.  And I was sitting around where Mrs. Bell was.  And

3    so every time we did the housecleaning, Your Honor, like right

4    now we would be faced -- you -- facing you and we would discuss

5    everything, and then when the panel came in, we were placed on

6    the other side of the table so that way we could be addressing

7    like the members are out there in the gallery right now.

8         And so I felt that there was a way to protect me and

9    my codefendant from any assumptions made against us, and so I

10    had the opportunity to be provided with clothing from my

11    attorney and my family to make sure that there was no unfair

12    assumptions made.  But yet, right when it was time to bring the

13    actual jury pool in, the actual jurors that actually made the

14    cut, I don't know if it was a mistake, Your Honor, but I was on

15    this side of the table.  I was actually standing right where

16    Mrs. Bell is sitting right now.  And so the jury was paraded

17    right through here and they had to go to -- right through here

18    to the actual jury room, but before they went, they actually

19    got their seats here.

20         And so one by one those jurors came through and they

21    actually got to look at me in these shackles.  And so right

22    away I was concerned about was this a situation that would harm

23    me later by one of these jurors or multiple jurors thinking

24    that I was already guilty.  And I wasn't familiar with the

25    process.

1              THE COURT:  I'm familiar with the nature of your

2     complaint.  It appears in your written allocution at page 4.

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  Quote, "The jury paraded right down the

5     aisle with me directly in front of them, shackled the way that

6     I was in full view of the wrong side of the table looking like

7     I was already guilty."

8              The Court finds that defendant's recollection of his

9     dress and restraint is incorrect.  From voir dire to verdict,

10    this Court, court staff, marshals, prosecutors, defense counsel

11    and the court security officers worked tirelessly to ensure

12    that the table provided cloaking and that your manner of dress

13    and the way that you were seated at that table were all

14    designed by all involved to ensure that we didn't communicate

15    anything by the nature of your dress and restraints.

16             In fact, I worked tirelessly with the marshals, the

17    court security officer, the courtroom deputy and the clerk's

18    office to ensure that the configuration of the room, that the

19    cloaking of the table and the placement of your restraints at

20    no time were within view of venire members and the eventual

21    jury.  And because of the way this Court is configured, there's

22    little to zero probability that had any impact on your case,

23    either at the voir dire phase or when the jury was seated.

24             So we carefully monitored that at all times, and I

25    find that Mr. Elza in particular was diligent in ensuring that

1    your manner of dress and the way in which you were restrained
2    would never affect any impression that venire members or
3    eventual jurors had about you or your case.  So I understand
4    the nature of your concern, but I observed it from this perch
5    from start to finish and at no time did that have any bearing
6    on the way people viewed you.  So I want to reassure you that I
7    worked very closely with defense counsel, the Government and
8    all of the court staff to make sure that that would have no
9    affect on your case.
10             (Counsel and defendant conferred off the record.)
11             THE COURT:  And at this time, do you have any
12    additional allocution that you would like to provide in
13    addition to Defendant's Exhibit A which I have admitted, I have
14    read and I will give weight to?
15             THE DEFENDANT:  Your Honor?
16             THE COURT:  Please proceed.
17             THE DEFENDANT:  Okay.  I would just like to take this
18    time right now to -- just to thank you.  You know, this
19    process, like I told you, I didn't want to be here.  I
20    apologize for this Court and for the members that have to
21    actually go through this process.  And I mean that from the
22    bottom of my heart, you know.  This situation, it is what it
23    is, we have to address it.  I'm standing here before you right
24    now and I'm basically asking your mercy.  I'm basically asking
25    for an opportunity at a life that I've tried my best at times,

1    you know, to do the right thing.  And it bit me -- it bit me

2    this time.  I trusted the Government and the Government didn't,

3    in my own view, act in good faith towards me.

4         But regardless, I'm here in front of you and I take

5    this situation seriously and I don't take it lightly.  And from

6    day one since I've been here, I've been doing everything that I

7    can to try to make myself to be a better man regardless of my

8    location.  So I just thank you for this opportunity.

9         THE COURT:  Thank you, Mr. Barrow.  The Court will

10   give appropriate weight to your oral allocution.  I'll consider

11   that a supplement to the written allocution that you submitted

12   as Defendant's Exhibit A.

13        At this time, does counsel for the defendant know of

14   any reason why lawful sentence may not be imposed?

15        MR. ELZA:  No, we're ready to proceed with sentence,

16   Your Honor.

17        THE COURT:  Any reason known to the Government?

18        MS. BELL:  No, Your Honor.

19        THE COURT:  Having considered the permissible factors

20   set forth at 18 U.S.C. Section 3553(a), the advisory sentencing

21   guidelines, the conduct admitted in the factual resume, the

22   capable, effective and impeccable assistance of defense

23   counsel, and all mitigating and aggravating factors, it is the

24   judgment of the Court that the defendant Mandis Charles Barrow

25   is hereby committed to the custody of the Federal Bureau of

1    Prisons for a period of life.  This represents a sentence

2    within the advisory guidelines range in this case.

3            The Court does not order a fine because defendant

4    lacks the financial resources or future earning capacity to pay

5    a fine.  The Court, however, does order a mandatory special

6    assessment of $100 as to Counts 1, 2 and 3 for a total of $300,

7    which is due and payable immediately.

8            This sentence shall run consecutively to any sentence

9    which may be imposed in case number 2:22-cr-001-Z-01 presently

10    pending in the Northern District of Texas Amarillo Division.

11    This case involves a pending revocation of supervised release.

12            The Court states that it does not order restitution

13    because there are no identifiable victims other than society at

14    large.

15            The Court further orders that upon release from

16    imprisonment the defendant shall be placed on supervised

17    release for a term of five years as to each count of

18    conviction, which will run concurrently.

19            While on supervised release, defendant shall comply

20    with the mandatory conditions listed 18 U.S.C. Section 3583(d)

21    and Section 5D1.3(a), the standard conditions listed at Section

22    5D1.3(c) of the Guidelines Manual, and the following

23    discretionary, special and additional conditions of supervised

24    release which are derived from Sections 5D1.3(b), (d) and (e)

25    of the Guidelines Manual.

 1          Number one, the defendant shall participate in

 2   outpatient mental health treatment services as directed by the

 3   probation officer until successfully discharged.  These

 4   services may include medications prescribed by a licensed

 5   physician.  The defendant shall contribute to the cost of

 6   services rendered copayment at a rate of at least $40 per

 7   month.

 8          Number two, the defendant shall participate in an

 9   outpatient program approved by the probation officer for

10   treatment of narcotic drug or alcohol dependency that will

11   include testing for the detection of substance use, abstaining

12   from the use of alcohol and all other intoxicants during and

13   after completion of treatment and contributing to the cost of

14   services rendered copayment at the rate of at least $40 per

15   month.

16          Now, Mr. Elza, these conditions of supervised release

17   were set forth in the written notice of intent to impose

18   conditions of supervised release.  Did you and your client

19   receive a timely copy of that document?

20          MR. ELZA:  We received them yesterday and were able

21   to go over them last night and sign them.

22          THE COURT:  And did you specifically explain the

23   discretionary, special and additional conditions of supervision

24   reflected on page 4?

25          MR. ELZA:  I did, Your Honor.

 1          THE COURT:  And does your client have any objections

 2    to the conditions of supervised release stated in the written

 3    notice and pronounced orally at sentencing?

 4          MR. ELZA:  No, Your Honor.

 5          THE COURT:  And, Ms. Bell, did the Government receive

 6    a timely copy of that notice?

 7          MS. BELL:  Yes, Your Honor.

 8          THE COURT:  And does the Government have any

 9    objections to the conditions of supervision stated therein?

10          MS. BELL:  No objections.

11          THE COURT:  Any objections to the Court's

12    pronouncement of the conditions of supervised release?

13          MS. BELL:  No, Your Honor.

14          THE COURT:  The notice and conditions of supervised

15    release stated therein are hereby adopted, ordered and imposed

16    as just pronounced by the Court.  The Court did receive a fully

17    executed copy of that notice.  It is dated January 18, 2024.

18    It bears the signature of the defendant, defense counsel and

19    this Court.  It's made a part of the record in this case and in

20    any record on appeal.

21          The Court will now state its reasons for imposing

22    this particular sentence.

23          Here, the sentence is sufficient but not greater than

24    necessary to comply with the statutory purposes of 18 U.S.C.

25    Section 3553(a), specifically the reasons previously stated by

1    the Court in adjudicating defendant's motion for downward

2    variance.  The Court incorporates by reference those reasons as

3    the Court's statement of reasons.

4         For every reason identified as aggravating in this

5    case specific to 3553(a) factors that apply, the Court did

6    consider the significant mitigating factors reflected in the

7    sentencing memorandum and also in the PSR, and the Court does

8    find defendant received capable and effective representation in

9    presenting those mitigating factors throughout the sentencing

10   process.  And the Court specifically considered defendant's

11   difficult upbringing reflected in PSR paragraphs 54, 55 and 56.

12        The Court imposed a term of supervised release

13   because it'll provide an added measure of deterrence and

14   protection.  Guided by the Fifth Circuit's opinion in Diggles

15   and cases applying same, this Court adopted, imposed and

16   ordered the discretionary conditions of supervised release

17   because they are consistent with Section 3583(d)(1), (d)(2) and

18   (d)(3), and the Court expressly states that the discretionary

19   conditions of supervised release involve no greater deprivation

20   of liberty than reasonably necessary.  This is a requirement of

21   3553(a)(2)(B), (a)(2)(C) and (a)(2)(D).

22        Regarding the denial of federal benefits, as noted in

23   PSR paragraphs 88 and 89, defendant, having been convicted of a

24   second drug distribution offense, shall be ineligible for any

25   and all federal benefits for up to ten years at the discretion

1    of the Court.  However, this Court is declining to exercise its

2    discretion in this case and expressly declines to make

3    defendant ineligible for federal benefits.  Stated differently,

4    the Court is exercising its discretion in the opposite

5    direction and declining to deny federal benefits to defendant.

6            The Court has now stated the sentence and its reasons

7    therefore.

8            Does defense counsel have any objection to the

9    statement of sentence?

10           MR. ELZA:  No, Your Honor.

11           THE COURT:  Any objection to the statement of

12    sentence from the Government?

13           MS. BELL:  No, Your Honor.

14           THE COURT:  The Court hereby orders the sentence

15    imposed as stated.

16           Finally and emphatically, even if the correct

17    advisory guidelines range was not considered, this Court would

18    have imposed the exact same sentence had it not made the error

19    and it would have done so for the exact same reasons given

20    during the sentencing hearing, regardless and irrespective of

21    the applicable advisory guidelines range.

22           Stated differently, had defendant prevailed on his

23    objections affecting the calculation of the guidelines range

24    culminating in a lesser guidelines range, this Court would have

25    used the tool of upward variance to arrive at the exact same

1    sentence for the exact same reason, life imprisonment.

2            Additionally, this Court presided over the

3    suppression hearing, pretrial conference, trial and this

4    sentencing and was thereby well acquainted with the relevant

5    facts, evidence, testimony, exhibits and jurisprudence

6    necessary to balance the Section 3553(a) factors and reach this

7    result, life imprisonment.

8            Now, Mr. Slater, I will hear your requested

9    recommendations for medical care, vocational training and

10   residential placement.

11           Beginning with medical, PSR paragraphs 60, 61 and 62,

12   alongside the addendum, reflect that defendant has suffered

13   from mental health issues; some orthopedic issues, including a

14   hernia; and that defendant is expressly interested in mental

15   health treatment and substance abuse treatment.

16           Are there particular programs you would request?

17           MR. ELZA:  No, I think it starts with an evaluation

18   to see what he needs.  My -- it's not my understanding -- and I

19   know that he will follow the recommendations up to and

20   including mental health treatment, individual, group, possibly

21   medication if that's recommended.  These go back a long ways

22   and have not been treated, so we don't really have a starting

23   point.  I think we need that initial evaluation that the Bureau

24   of Prisons can provide.

25           THE COURT:  Okay.  Any objection from the Government?

1          MS. BELL:  No, Your Honor.

2          THE COURT:  The Court does recommend that the

3   defendant be allowed to participate in a full medical

4   evaluation, if necessary be considered for initial placement in

5   a Federal Medical Center or FMC to address the myriad

6   conditions reflected in PSR paragraphs 60, 61, 62 and the

7   addendum.  The Court further recommends that the defendant be

8   allowed to participate in a mental health evaluation to

9   identify possible counseling and treatment for the myriad

10  traumas that appear in the PSR and addendum, and if prescribed

11  and monitored by a licensed physician, mental health

12  prescription drugs if necessary.

13          Finally, the Court does recommend that defendant be

14  allowed to participate in the most intensive, if possible,

15  Residential Drug Abuse Program, and the Court finds that

16  defendant is a good candidate for drug rehabilitation treatment

17  and substance abuse treatment given his multiple statements to

18  the probation officer and this Court that he is interested in

19  same.

20          There is no request for vocational training, but I

21  know defendant is manifestly intelligent.  I know that he has

22  some schooling up to this point.  I do want to give you an

23  opportunity to request coursework or any sort of training, be

24  it vocational or more purely scholastic.

25          MR. ELZA:  He is interested in any scholastic

1    opportunities that are available to him, be those legal-based

2    would be the first preference or business-based.  He is, and I

3    skipped that in my closing statement, he's incredibly bright,

4    incredibly bright, better research skills than most any new

5    lawyer.

6              THE COURT:  Okay.  Any objection, Ms. Bell?

7              MS. BELL:  No, Your Honor.

8              THE COURT:  The Court does recommend that the

9    defendant be allowed to pursue any and all education deemed

10   consistent with his security classification and eligibility to

11   include scholastic training in fields of interest, including

12   business, ministry and other fields.  The Court finds the

13   defendant is an ideal candidate for continued vocational and

14   educational training given his manifest intelligence and his

15   participation and completion of programs through the detention

16   period.

17             Regarding residential placement, I know that

18   defendant has family in the Panhandle and also in the

19   Dallas/Fort Worth Metroplex.

20             Are you prioritizing proximity to family or specific

21   programs in requesting particular facilities?

22             MR. ELZA:  Based on -- we talked about this a lot.

23   Based on him, his connections here -- he does have some family

24   in the Arizona -- not the Arizona, I'm sorry -- in Arizona, and

25   from a distance perspective probably would benefit from one of

```
 1    the facilities in Tucson.
 2            THE COURT:  Okay.  So I have a list of facilities
 3    that have residential drug programs.  That includes FCI
 4    Phoenix, but is it your understanding that there is also a
 5    facility at Tucson that would match his likely security
 6    classification?
 7            MR. ELZA:  Actually, I went through the list and I
 8    overlooked Phoenix.  That would actually be the preference.
 9            THE COURT:  Okay.
10            MR. ELZA:  You know, we went through it.  I just
11    missed that last night.
12            THE COURT:  Okay.  So I can do Phoenix and then in
13    the alternative Tucson.
14            Any objection, Ms. Bell?
15            MS. BELL:  No objection.
16            THE COURT:  This Court does recommend for reasons of
17    separation from the Northern District of Texas and Amarillo
18    Division that the defendant be allowed to serve this term of
19    incarceration in the western region of the Bureau of Prisons
20    system, if possible FCI Phoenix, in the alternative FCI Tucson,
21    and at all times this recommendation is subject to the Bureau
22    of Prisons exercising its discretion to determine defendant's
23    security classification and eligibility.
24            And, Mr. Barrow, do you understand that I made as
25    many recommendations as possible for your continued medical,
```

1    vocational and residential care, but it's ultimately the Bureau
2    of Prisons that will decide your security classification and
3    eligibility?  Do you understand that?
4              THE DEFENDANT:  Yes.
5              THE COURT:  Okay.  The Court notes that this
6    defendant has been found guilty on all counts of the
7    superseding indictment.  However, I do want to allow the
8    Government an opportunity to dismiss any pending indictments or
9    charges that need to be dismissed as to defendant -- as to this
10   defendant only.
11             MS. BELL:  There is nothing to dismiss, Your Honor.
12             THE COURT:  Okay.  Now, Mr. Barrow, if you decide to
13   appeal, your notice of appeal must be filed with this court
14   within 14 days of the date judgment is entered in your case or
15   within 14 days of the Government entering its notice of appeal.
16   And if you do decide to pursue that appeal, you have an
17   absolute right to apply for leave to appeal in forma pauperis
18   or IFP.  This means that you may be able to pursue that appeal
19   at no cost to yourself but instead at a cost to the Government.
20             Mr. Elza, did you and your client receive a timely
21   copy of the notice of right to appeal?
22             MR. ELZA:  Yes, we received it yesterday, had an
23   opportunity to go over it and sign it last night.
24             THE COURT:  And did you specifically explain to the
25   defendant the 14-day period that applies to the notice of

1    appeal?

2         MR. ELZA:  I did, Your Honor.

3         THE COURT:  And does your client have any objections

4    to the remaining appellate rights arising under this notice and

5    described in this notice?

6         MR. ELZA:  No, he understands those are his appellate

7    rights.

8         THE COURT:  Okay.  And, Ms. Bell, did the Government

9    receive a timely copy of the notice of right to appeal?

10        MS. BELL:  Yes, Your Honor.

11        THE COURT:  And does the Government have any

12   objections to the appellate rights described in that notice?

13        MS. BELL:  No, Your Honor.

14        THE COURT:  The Court did receive and did review a

15   fully executed copy of the notice of right to appeal.  It bears

16   the signature of the defendant, defense counsel and this Court.

17   It is dated January 18, 2024.

18        And, Mr. Barrow, I know you've familiarized yourself

19   with law libraries and those resources.  Please be mindful of

20   the distinction between this notice of right to appeal and the

21   notice of appeal.  That second document must be filed within

22   that 14-day period we discussed.  If you have questions about

23   the notice of appeal, please consult with counsel.  He can

24   explain deadlines and deliverables.

25        Is there anything further from the Government?

1          MS. BELL:  No, Your Honor.

2          THE COURT:  Anything further from the defendant?

3          MR. ELZA:  No, Your Honor.

4          THE COURT:  Mr. Barrow, you are hereby remanded into

5    the custody of the United States Marshal.  We are adjourned.  I

6    wish you good luck.

7          The Court stands adjourned for the remainder of the

8    day.  Counsel are excused.

9          (The proceedings adjourned at 4:20 p.m.)

10                          ----

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT - AMARILLO DIVISION

1          C E R T I F I C A T E

2          I, Shayna Montgomery, United States Court Reporter for

3      the United States District Court in and for the Northern

4      District of Texas, Amarillo Division, hereby certify that the

5      above and foregoing contains a true and correct transcription

6      of the proceedings in the above entitled and numbered cause.

7

8          WITNESS MY HAND on this 7th day of April, 2024.

9

10                          /s/Shayna Montgomery
                           _____
11                          SHAYNA MONTGOMERY, RMR, CRR
                           United States Court Reporter
12                          205 SE 5th Ave, Room 133
                           Amarillo, Texas 79101
13                          (806) 468-3816

14

15

16

17

18

19

20

21

22

23

24

25